**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREGORY JOHNSON; WILLIAM
RODWELL; EDWARD RANGEL; KELLY
MORRELL,
            *Plaintiffs-Appellees,*

            and

DARLEEN STANTON,
                  *Plaintiff,*

ROORDA PIQUET & BESSEE, INC.,
Non-party appearing witness,
                  *Witness,*

            v.

CLAIR R. COUTURIER, JR.,
                  *Defendant,*

DAVID R. JOHANSON; NOLL
MANUFACTURING COMPANY
EMPLOYEE STOCK OWNERSHIP
PLAN AND TRUST; PENSCO, INC.;
JOHANSON BERENSON LLP; THE
EMPLOYEE OWNERSHIP HOLDING
CORPORATION, Employee Stock
Ownership Plan; N & NW
MANUFACTURING HOLDING
COMPANY, INC.; NOLL
MANUFACTURING COMPANY,
                  *Defendants,*

            and

ROBERT E. EDDY,
            *Defendant-Appellant.*

No. 08-17369

D.C. No.
2:05-cv-02046-
RRB-GGH

9695

GREGORY JOHNSON; WILLIAM
RODWELL; EDWARD RANGEL; KELLY
MORRELL,
*Plaintiffs-Appellees,*

and

DARLEEN STANTON,
*Plaintiff,*

ROORDA PIQUET & BESSEE, INC.,
Non-party appearing witness,
*Witness,*

v.

CLAIR R. COUTURIER, JR.,
*Defendant,*

ROBERT E. EDDY; NOLL
MANUFACTURING COMPANY
EMPLOYEE STOCK OWNERSHIP
PLAN AND TRUST; PENSCO, INC.;
JOHANSON BERENSON LLP; THE
EMPLOYEE OWNERSHIP HOLDING
CORPORATION, Employee Stock
Ownership Plan; N & NW
MANUFACTURING HOLDING
COMPANY, INC.; NOLL
MANUFACTURING COMPANY,
*Defendants,*

and

DAVID R. JOHANSON,
*Defendant-Appellant.*

No. 08-17373

D.C. No.
2:05-cv-02046-
RRB-GGH

GREGORY JOHNSON; WILLIAM
RODWELL; EDWARD RANGEL; KELLY
MORRELL,
                    *Plaintiffs-Appellees,*
            and
DARLEEN STANTON,
                            *Plaintiff,*

ROORDA PIQUET & BESSEE, INC.,
Non-party appearing witness,
                            *Witness,*

            v.

CLAIR R. COUTURIER, JR.,
                    *Defendant-Appellant,*
            and

ROBERT E. EDDY; DAVID R.
JOHANSON; NOLL MANUFACTURING
COMPANY EMPLOYEE STOCK
OWNERSHIP PLAN AND TRUST;
PENSCO, INC.; JOHANSON BERENSON
LLP; THE EMPLOYEE OWNERSHIP
HOLDING CORPORATION, Employee
Stock Ownership Plan; N & NW
MANUFACTURING HOLDING
COMPANY, INC.; NOLL
MANUFACTURING COMPANY,
                            *Defendants.*

No. 08-17375

D.C. No.
2:05-cv-02046-
RRB-GGH

Gregory Johnson; William
Rodwell; Edward Rangel; Kelly
Morrell,
　　　　　*Plaintiffs-Appellees,*

and

Darleen Stanton,
　　　　　　　　*Plaintiff,*

Roorda Piquet & Bessee, Inc.,
Non-party appearing witness,
　　　　　　　　*Witness,*

　　　　　v.

Clair R. Couturier, Jr.,
　　　　　*Defendant-Appellant,*

and

Robert E. Eddy; David R.
Johanson; Noll Manufacturing
Company Employee Stock
Ownership Plan and Trust;
Pensco, Inc.; Johanson Berenson
LLP; The Employee Ownership
Holding Corporation, Employee
Stock Ownership Plan; N & NW
Manufacturing Holding
Company, Inc.; Noll
Manufacturing Company,
　　　　　　　　*Defendants.*

No. 08-17631

D.C. No.
2:05-cv-02046-
RRB-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted
May 7, 2009—San Francisco, California

Filed July 27, 2009

Before: Procter Hug, Jr., Michael Daly Hawkins, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

**COUNSEL**

Theodore M. Becker (argued), Thomas M. Peterson, Joseph E. Floren, and Elizabeth A. Frohlich, Morgan, Lewis & Bockius LLP, for appellant Clair R. Couturier, Jr.

Christopher J. Rillo, Lars C. Golumbic, and Dipal A. Shah, Groom Law Group Chartered, for appellant David R. Johanson.

Gary D. Greenwald (argued), Ron Kilgard, and Gary A. Gotto, Keller Rohrback, PLC, and Terence J. Devine, Devine, Markovits & Snyder, LLP, for the appellees.

Carol A. De Deo, Deputy Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, Plan Benefits Security Division, Elizabeth Hopkins (argued), Counsel for Appellate and Special Litigation, and Robyn M. Swanson, Trial Attorney, U.S. Department of Labor, for the Secretary of Labor as amicus curiae supporting appellees.

**OPINION**

TALLMAN, Circuit Judge:

In his capacity as president of Noll Manufacturing Company ("Noll") and its successors, Clair R. Couturier, Jr., together with his fellow directors, diverted almost $35 million

of corporate assets—at least a third of the corporation's value, even in Couturier's own estimation—to his own possession through the buyout of deferred compensation agreements. Plaintiffs, all of whom are participants in Noll's employee stock ownership plan ("ESOP"), filed suit against Couturier and two other directors alleging, *inter alia*, breach of fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). This case requires us to consider whether the district court abused its discretion when it enjoined advancement of defense costs and froze Couturier's assets. We conclude that the district court did not abuse its discretion, but remand to allow the district court, in the first instance, to set the terms and conditions of a surety bond sufficient to secure Couturier and the other defendants against any harm that might wrongfully befall them as a result of the issuance of each injunction.

# I

## A

Noll, a closely held corporation founded in 1942, manufactured and sold galvanized sheet metal products. Through restructuring, Noll was succeeded first by N&NW Holding Company ("N&NW") in 2001, and then by The Employee Ownership Holding Company ("TEOHC") in 2004.

Noll's founder, who died in 1980, established the ESOP in 1977 to give the company's employees an opportunity to share in its success. His will reflects an intent that the ESOP own the entire company. However, for reasons we cannot discern from the record, the ESOP did not acquire full ownership of Noll until 2001.

Clair R. Couturier, Jr., became President of Noll in 1999. Noll's Board of Directors designated Couturier the sole trustee for the ESOP as of April 24, 2001. Attorney David R. Johanson, who had previously represented the ESOP in con-

nection with its leveraged purchase of all remaining Noll stock, was appointed a Noll director on June 20, 2001, joining Couturier and Noll's general counsel on the Board. However, after the transfer of ownership to N&NW later that year, Couturier and Johanson remained as the sole directors.

This litigation traces its genesis to the sizeable deferred compensation awarded to Couturier during his tenure as president of Noll and its successors. Prior to 2001, retired Noll executives were entitled to continue receiving 75 percent of their base salary, with an adjustment made every three years, under a Compensation Continuation Agreement ("CCA"). In 2001, however, Johanson drafted three documents that tied deferred executive compensation to company value: (1) an Equity Incentive Plan ("EIP") establishing an incentive stock option plan for key management personnel; (2) an Incentive Stock Option Agreement ("ISO") granting Couturier 80,000 shares at a strike price of $34;[1] and (3) a Value Enhancement Incentive Plan ("VEIP") creating additional synthetic equity. At the time these plans were enacted, one director reportedly opined that this "is not too good" for the ESOP; they were nonetheless approved by the Board on June 13, 2001.[2]

After the reorganization of Noll under N&NW, Johanson and Couturier, remaining as the sole directors, orchestrated additional incentive agreements in February 2002. The 2002 EIP allowed for issuance of up to 110,000 shares, with no more than 93,500 shares being awarded to a single grantee. The 2002 ISO again granted to Couturier 80,000 shares at a strike price of $34 per share. The 2002 VEIP created additional synthetic equity for Couturier. Couturier and Johanson

---

[1]The effect of the 2001 ISO is unclear; the governing EIP allowed for issuance of only 50,000 shares, with a grant to any single employee not exceeding 25,000 shares.

[2]Although the board minutes reflect that all three directors, including Couturier, voted to approve these compensation programs, one director later claimed that he had abstained from the vote.

also increased Couturier's monthly CCA stipend by about 33 percent and enacted a Supplemental Executive Retirement Plan providing additional deferred compensation.[3]

The advent of 2003 heralded further expansion of Couturier's compensation. That year, Couturier and Johanson approved a retroactive annual cash bonus to Couturier equaling ten percent of the dollar amount of external debt repaid on certain loans. Some of these loans were refinanced later that same year. N&NW then purchased a $5.5 million home ("the Palm Desert home") and a $325,000 private golf club membership in Palm Desert, California, for Couturier's personal use.

After unsuccessful negotiations with Alliance Holdings, Inc. for the acquisition of N&NW—during which the value of Couturier's interest in the company became a point of contention—Couturier and Johanson appointed Couturier's financial advisor, Robert E. Eddy, as Special Trustee to the ESOP. Eddy's role was to evaluate proposed transactions involving N&NW and the ESOP, including monetization of Couturier's financial interest in N&NW. Couturier and Johanson ultimately opted to merge N&NW into TEOHC, which Johanson had incorporated in Delaware on December 15, 2003. As the incorporator, Johanson appointed himself, Couturier, Eddy, and accountant James Roorda as directors. Pursuant to a new plan, the ESOP was now to be administered by Trustees appointed by the TEOHC Board of Directors; the Board members appointed themselves as Trustees.

---

[3]Benefits Consultants, Inc. provided a contemporaneous opinion finding that the CCA, ISO, and VEIP did not constitute an unreasonable level of compensation, but specifically did not render an opinion as to whether adopting these agreements was consistent with ERISA fiduciary duties. Moss Adams Advisory Services ("Moss Adams") provided a contemporaneous opinion concluding that the 2002 ISO was fair to the ESOP from a financial point of view.

On July 20, 2004, pursuant to the merger transaction, Couturier received over $26 million in cash, title to the Palm Desert home, a Bentley automobile valued at $200,000, and various other benefits in exchange for his deferred compensation interests. The parties value this buyout package at $34.8 million.[4] Accordingly, Couturier's overall compensation package equals about 65 percent of TEOHC's assets as of June 2004, and about 80 percent of N&NW's assets as of each of the prior two years. The package also exceeded by more than two-fold N&NW's 2002 stock market value.

## B

On October 11, 2005, several former and current Noll employees (collectively, "Plaintiffs"), all of whom are ESOP participants, filed suit against Couturier, Johanson, and Eddy (collectively, "Defendants") in the United States District Court for the Eastern District of California. Claiming that Couturier was vastly overcompensated, Plaintiffs' amended complaint seeks relief from Defendants' alleged breach of fiduciary duties in their capacities as ERISA fiduciaries and corporate directors. Under ERISA, Plaintiffs seek: (1) to hold Defendants jointly and severally liable for all ESOP losses related to their misconduct; (2) creation of a constructive trust for disgorgement of Defendants' wrongful profit; and (3) removal of Eddy as ESOP Trustee. Plaintiffs also seek to hold Couturier and Johanson jointly and severally liable for losses suffered by Noll and N&NW because of directorial misconduct, and all three Defendants jointly and severally liable for losses suffered by TEOHC because of directorial misconduct. Finally, Plaintiffs also accuse Johanson and his law firm of

---

[4]Moss Adams issued a qualified opinion that the merger transaction was fair to the ESOP from a financial and economic perspective. It specifically excluded any consideration of the fairness of Couturier's compensation package. The latter issue was separately analyzed by The California Appraisal Institute, which concluded that Couturier's buyout package did not exceed "adequate consideration" under ERISA.

professional negligence, and on this basis seek to hold them jointly and severally liable for losses suffered by Noll, N&NW, and TEOHC.

## C

The Defendant directors, officers, and trustees entered into multiple and largely identical indemnification agreements with Noll and its successors between 2001 and 2005. These agreements generally indemnify Defendants for any liabilities incurred in their service as directors—and, in the case of Couturier and Eddy, in their service as ESOP trustees—so long as any such liability did not involve "deliberate wrongful acts" or "gross negligence."[5] The agreements are governed by California law "to the extent not preempted by federal law"; Couturier's trustee indemnification further specifies that it is "[s]ubject to the relevant provisions of [ERISA]."

At issue here are provisions within the indemnification agreements requiring TEOHC to advance defense costs. Seeking advancement as promised in the indemnification agreements, each Defendant has executed an undertaking to repay TEOHC for "any expenses paid by it on my behalf in advance of the final disposition of the [instant] suit[ ], if it shall ultimately be determined that I am not entitled to be indemnified by the Company" under Delaware law.

---

[5]Seven of the ten indemnification agreements covering Couturier, Johanson, and Eddy condition indemnification on an absence of "deliberate wrongful acts" and "gross negligence" on the part of the indemnitee. However, the agreement indemnifying Couturier as a trustee excepts from coverage losses resulting from his "grossly negligent and/or intentional misconduct." One of the two agreements indemnifying Eddy as a trustee also excepts from coverage losses resulting from his "grossly reckless and/or intentional misconduct," while the other excepts from coverage losses resulting from his "negligent, grossly reckless and/or intentional misconduct." Because our ensuing analysis is identical regardless of which subset of these five exceptions applies, we refer to the ten agreements as indemnifying Defendants so long as any such liability did not involve deliberate wrongful acts or gross negligence.

After learning that Johanson and Eddy had asserted a claim for advancement of defense costs against TEOHC in a related commercial arbitration proceeding conducted before the American Arbitration Association ("AAA"), Plaintiffs and the Department of Labor ("DOL") sought to intervene. The arbitrator declined to allow intervention, finding that "determination of the contract interpretation questions presented here would not be aided by input from these third parties," and ordered TEOHC to advance Johanson's and Eddy's defense costs. After Plaintiffs obtained an Order To Show Cause why the advancement should not be enjoined, the district court on September 26, 2008, found that Plaintiffs were not bound by the AAA decision and had met their burden justifying issuance of a preliminary injunction prohibiting the advancement of defense costs. Couturier, Johanson, and Eddy all timely appealed this injunction.[6]

On October 24, 2008, the district court also granted a second preliminary injunction: (1) preventing Couturier from "transferring, secreting, assigning, pledging, mortgaging, or hypothecating" the assets he received as part of the 2004 buyout package without prior court approval; and (2) ordering an accounting of these assets within 20 days. However, the court limited this injunction to allow Couturier "to cover normal living expenses and legal fees." Couturier timely appealed this second preliminary injunction.

**D**

A subsidiary of Gibraltar Industries, Inc. purchased TEOHC's assets on April 10, 2007, for almost $61 million. Approximately $15.8 million of the sale proceeds remained for distribution to the ESOP after payment of bank debt, executive compensation, closing costs, and escrow. Consulting Fiduciaries, Inc., the current ESOP trustee, distributed $5 mil-

---

[6]On January 20, 2009, we denied Defendants' emergency motion for a stay.

lion to the participants in January 2008. The balance of funds has been withheld, at least partly in escrow, to allow TEOHC to pay for its own legal expenses once directors' and officers' liability ("D&O") insurance coverage is exhausted and to satisfy the indemnification agreements with Defendants.

## II

Defendants collectively make three separate arguments to avoid invalidation of these agreements under ERISA: (1) that they are not ERISA fiduciaries; (2) that the setting of executive compensation is a business decision not subject to ERISA; and (3) that whether TEOHC is obligated to advance their defense costs is purely a matter of state contract law. We consider and reject each argument in turn.

## A

**[1]** Congress enacted ERISA to establish "minimum standards . . . assuring the equitable character of [benefit] plans and their financial soundness." 29 U.S.C. § 1001(a). To accomplish this goal, ERISA requires that plan assets be held in trust for the exclusive benefit of plan participants and their beneficiaries. *Id.* § 1103. Moreover, "authority to control and manage the operation and administration of the plan" must be vested in one or more named fiduciaries. *Id.* § 1102(a). In order "to protect . . . the interests of participants in employee benefit plans and their beneficiaries," ERISA also imposes "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." *Id.* § 1001(b). These standards include duties of loyalty and care, *id.* § 1104(a)(1), as well as a prohibition on self-dealing, *id.* § 1106(b)(1).

**[2]** An ESOP is a type of ERISA plan "designed to invest primarily in" the stock of the employer who created it. *Id.* § 1107(d)(6)(A). "Congress expressly intended that the ESOP would be both an employee retirement benefit plan and a technique of corporate finance that would encourage

employee ownership." *Edgar v. Avaya, Inc.*, 503 F.3d 340, 346 (3d Cir. 2007) (quotation omitted). Although the creation of ESOPs necessitated their exemption from certain ERISA requirements, such as asset diversification, the core fiduciary duties of loyalty and care as well as the prohibition against self-dealing[7] remain in effect. *Id.*

[3] We construe ERISA fiduciary status "liberally, consistent with ERISA's policies and objectives." *Ariz. State Carpenters Pension Trust Fund v. Citibank, (Ariz.)*, 125 F.3d 715, 720 (9th Cir. 1997). ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). Thus, ERISA—and ESOP—fiduciaries include not only those specifically named in the employee benefit plan, 29 U.S.C. § 1102(a), but also any individual who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," 29 U.S.C. § 1002(21)(A)(i). We have accordingly recognized that where members of an employer's board of directors have responsibility for the appointment and removal of ERISA trustees, those directors are themselves subject to ERISA fiduciary duties, albeit only with respect to trustee selection and retention.[8] *Batchelor v. Oak Hill Med. Group*, 870 F.2d 1446, 1448- 49 (9th Cir. 1989).

---

[7]The prohibition against self-dealing is, however, curtailed in order to allow plan acquisition of employer stock. 29 U.S.C. § 1108(e).

[8]In reaching this conclusion, we have relied on an interpretive bulletin issued by the DOL in 1975, which provides:

Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?

A: Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in [29 U.S.C. § 1002(21)(A)]. For example, the board of directors

**[4]** Because all three Defendants served as ESOP trustees, each was an ERISA fiduciary subject to the duties of loyalty and care and to the prohibition against self-dealing. Couturier served as the sole Trustee of the Noll ESOP beginning on April 24, 2001. Eddy was appointed Special Trustee to the ESOP in 2003. After Noll merged into TEOHC in 2004, all three Defendants were appointed to the ESOP Board of Trustees.

Johanson argues, without any citation to the record, that he served on the TEOHC ESOP Board of Trustees for only one day, and thus never had the opportunity to take any actions that would subject him to ERISA fiduciary duties. Be that as it may, Johanson, together with Couturier and Eddy, also served on the TEOHC Board of Directors. The TEOHC ESOP Plan specified that it was to "be administered by a Board of Trustees composed of individuals *who will be appointed by the unanimous action of the Board [of] Directors*" of TEOHC. (Emphasis added.) The Plan further vested the power of trustee removal in the TEOHC Board of Directors. Thus, as the de facto decision makers of closely held and related entities, all three defendants—including Johanson— also served as ERISA fiduciaries with respect to appointment and removal of ESOP trustees. *See Batchelor*, 870 F.2d at 1448- 49; 29 C.F.R. § 2509.75-8(D-4).

**B**

ERISA confers upon federal district courts exclusive juris-diction over any civil action brought by a plan participant or

---

may be responsible for the selection and retention of plan fidu-ciaries. In such a case, members of the board of directors exercise "discretionary authority or discretionary control respecting man-agement of such plan" and are, therefore, fiduciaries with respect to the plan. However, their responsibility, and, consequently, their liability, is limited to the selection and retention of fidu-ciaries . . . .

29 C.F.R. § 2509.75-8(D-4).

beneficiary for equitable relief from a trustee's breach of fiduciary duty. 29 U.S.C. § 1132(a), (e). Johanson argues, however, that the district court lacked subject matter jurisdiction over the instant case because the actions challenged by Plaintiffs—actions that resulted in the allegedly excessive compensation of Couturier—are business decisions not subject to ERISA.

[5] Decisions relating to corporate salaries generally do not fall within ERISA's purview. But where plan assets include the employer's stock, the value of those assets depends on the employer's equity. Employee compensation levels are, of course, one of the many business expenditures reducing the value of the overall equity of any company. On the other hand, "[v]irtually all of an employer's significant business decisions affect the *value* of its stock, and therefore the benefits that ESOP plan participants will ultimately receive." *Martin v. Feilen*, 965 F.2d 660, 666 (8th Cir. 1992). Taken to its logical conclusion, therefore, this line of thinking would, in the case of an ESOP, extend the application of ERISA to a corporation's annual expenditures on office supplies—clearly an absurd result. The Eighth Circuit has on this basis limited an ERISA fiduciary's duties "to transactions that involve investing the ESOP's assets or administering the plan." *Id.* Setting executive compensation levels does not obviously fall into either category. *See Eckelkamp v. Beste*, 201 F. Supp. 2d 1012, 1023 (E.D. Mo. 2002) (holding that a corporate director is not acting as an ESOP fiduciary in setting compensation levels).

[6] Nonetheless, we conclude that applying ERISA to the instant case does not risk encompassing within its confines any and all day-to-day corporate decisions shielded by the business judgment rule. Where, as here, an ESOP fiduciary also serves as a corporate director or officer, imposing ERISA duties on business decisions from which that individual could directly profit does not to us seem an unworkable rule. To the contrary, our holding merely comports with congressional

intent in establishing ERISA fiduciary duties as "the highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quotation omitted). To hold otherwise would protect from ERISA liability obvious self-dealing, as Plaintiffs allege occurred here, to the detriment of the plan beneficiaries.

## C

Defendants argue that whether TEOHC is obligated to advance their defense costs is purely a matter of state contract law, and that ERISA simply does not apply. ERISA preemption is a question of law that we review *de novo*. *Elliot v. Fortis Benefits Ins. Co.*, 337 F.3d 1138, 1141 (9th Cir. 2003).

**[7]** ERISA contains a broad preemption clause, such that with only limited exceptions it "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). As in *Boggs v. Boggs*, we "can begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects." 520 U.S. 833, 841 (1997); *see also Branco v. UFCW-N. Cal. Employers Joint Pension Plan*, 279 F.3d 1154, 1157, 1160 (9th Cir. 2002) (holding that ERISA's surviving spouse annuity preempts a testamentary transfer).

**[8]** Defendants' indemnification agreements specify that they are governed by California law. California allows advancement of defense costs "upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section."[9] Cal. Corp. Code § 317(f). Couturier, Johanson, and Eddy all submitted the req-

---

[9]Defendants' undertakings specify that they are governed by Delaware law, which similarly establishes that advancement is permissible upon receipt of an undertaking. Del. Code Ann. tit. 8, § 145(e).

uisite undertakings, thus apparently rendering advancement of their defense costs enforceable under state law.

**[9]** However, Defendants' indemnification agreements provide complete indemnity so long as the challenged acts or omissions do not involve deliberate wrongful acts or gross negligence. ERISA, by contrast, requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The indemnification agreements thus effectively limit Defendants' liability under ERISA because, so long as they do not engage in deliberate wrongful acts or gross negligence, Defendants will be indemnified—even if they violated the ERISA "prudent man" standard of care. Accordingly, application of state law in the instant case conflicts with ERISA and is preempted. *See Boggs*, 520 U.S. at 844 ("In the face of [a] direct clash between state law and the provisions and objectives of ERISA, the state law cannot stand.").

## III

With these principles in mind, we turn to an evaluation of the district court's decision to enjoin advancement of defense costs. "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008). "We review the grant or denial of a preliminary injunction for abuse of discretion." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). This review is "limited and deferential," and it does not extend to the underlying merits of the case. *Id.* (quoting *Lands Council v. Martin*, 479 F.3d 636, 639 (9th Cir. 2007)). A dis-

trict court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* (quoting *Lands Council*, 479 F.3d at 639). But "[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (quoting *Wildwest Inst. v. Bull*, 472 F.3d 587, 590 (9th Cir. 2006)) (alteration in original).

## IV

We conclude that the district court did not abuse its discretion in preliminarily enjoining TEOHC from advancing Defendants' defense costs. Plaintiffs established all four elements of the governing standard, and Defendants have failed to demonstrate that the district court based its decision either on an erroneous legal standard or on clearly erroneous findings of fact.

## A

## 1

[10] Plaintiffs have established that they are likely to succeed in proving that Defendants breached their fiduciary duties under ERISA. Plaintiffs allege that Defendants breached these obligations by engaging in a series of transactions that improperly diverted much of the equity in TEOHC (and thus in the ESOP) to Couturier. Plaintiffs claim that by engaging in these transactions, Defendants impermissibly placed Couturier's financial interests ahead of the ESOP. The district court correctly compared the size of Couturier's $34.8 million buyout package with the company's overall value, and properly noted its concern that this comparison by itself constitutes strong evidence that Defendants breached their fiduciary duties under ERISA. Couturier's buyout package of $34.8 million equaled nearly 65 percent of the company's

total assets as of June 2004, and exceeded by more than two-fold N&NW's 2002 value.

**[11]** In 2003, Moss Adams Advisory Services ("Moss Adams") recommended that Couturier be given no more than between $6 million and $9 million, the value of the deferred compensation agreements which N&NW carried on its books at that time. The record reveals that the Moss Adams fairness/valuation team was clearly uncomfortable with the package proposed by Couturier and Johanson, and refused to opine on the fairness of what ultimately became a $34.8 million package. On January 21, 2004, Moss Adams qualified its opinion to specifically exclude the "issues of whether the executive compensation for various executives and related packages represent 'reasonable' compensation," deferring to others the resolution of these matters. At least at this stage in the proceedings, it is difficult to understand how an ERISA fiduciary exercising the requisite care, and acting exclusively in the ESOP's interest, could have acquiesced to a buyout package for Couturier that apparently exceeded the fair market value by some $25 million. As trustees, Defendants should have opposed the buyout package. And as directors with authority over the selection and retention of trustees, Defendants should have recognized that Couturier was hopelessly mired in a clear conflict of interest involving such blatant self-dealing and sought his removal as an ESOP trustee.

**[12]** Because Plaintiffs are likely to succeed in proving that Defendants breached their ERISA duties, they are also likely to succeed in proving that Defendants are not entitled to indemnification, nor to advancement of defense costs, because section 410(a) of ERISA renders the governing agreements void. Section 410(a) specifies that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). Thus, "[i]f an ERISA fiduciary writes words in an instrument exonerating itself of

fiduciary responsibility, the words, even if agreed upon, are generally without effect." *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1418 (9th Cir. 1997).

Admittedly, ERISA does not bar the purchase of liability insurance by a plan, fiduciary, or employer. 29 U.S.C. § 1110(b). The DOL has therefore interpreted section 410 to permit indemnification of fiduciaries so long as the agreement "do[es] not relieve a fiduciary of responsibility or liability" under ERISA. 29 C.F.R. § 2509.75-4. In other words, an indemnification provision is valid if it "merely permit[s] another party to satisfy any liability incurred by the fiduciary in the same manner as insurance." *Id.* This DOL exemption does not, however, extend to indemnification of a fiduciary by the ERISA plan itself. *Id.* ("The Department of Labor interprets section 410(a) as rendering void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan."). The DOL has explained that "[s]uch an arrangement would have the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations." *Id.*

The indemnification agreements and associated advancement provisions at issue here clearly "purport[ ] to relieve" Defendants from their fiduciary responsibilities under ERISA. ERISA requires that a fiduciary discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The indemnification agreements, by contrast, indemnify Defendants so long as the liability for which coverage is sought did not involve any deliberate wrongful acts or gross negligence. Nor do the signed undertakings provide the ESOP with any recourse should Defendants be found to have violated only their fiduciary duties under ERISA. Conse-

quently, because Plaintiffs have shown probable success on the merits of their ERISA claims, they have also shown that section 410(a) likely renders void the indemnification agreements and advancement provisions therein.

Defendants nonetheless argue that section 410(a) does not apply because advancement would be made from corporate, not plan, assets. *See* 29 C.F.R. § 2510.3-101(h)(3) (establishing that corporate assets are not plan assets where the plan is an ESOP). But given that TEOHC's plan of liquidation provides for payment of all remaining equity to ESOP participants as shareholders, this is not a case where, in accordance with 29 C.F.R. § 2509.75-4, the indemnification agreement "merely permit[s] another party [other than the plan] to satisfy any liability incurred by the fiduciary." To the contrary, any proceeds taken from TEOHC's remaining funds to pay Defendants' defense costs will, dollar for dollar, reduce the funds available for distribution to ESOP participants. In other words, advancement is here tantamount to asking ESOP participants to pay for Defendants' defense costs, with no recovery possible or at least highly unlikely— even if Defendants breached their fiduciary duties to the ESOP—so long as Defendants did not engage in deliberate wrongful acts or gross negligence. Such a result is impermissible under section 410(a).

Finally, because the agreement indemnifying Couturier as a trustee specifies that it is "[s]ubject to the relevant provisions of [ERISA]," Couturier argues that his right to advancement is not void under section 410(a). This assertion overlooks two key points. First, the remaining three agreements indemnifying Couturier as a director contain no such limitation, even though in his capacity as director Couturier was subject to ERISA fiduciary duties with respect to appointment and retention of ESOP trustees. Second, as we explain above, Plaintiffs are likely to succeed in proving that Couturier did in fact breach his ERISA obligations, thus also

rendering this particular indemnification agreement unen-
forceable.

**2**

**[13]** The Supreme Court recently clarified that preliminary
injunctive relief is available only if plaintiffs "demonstrate
that irreparable injury is *likely* in the absence of an injunc-
tion." *Winter*, 129 S. Ct. at 375. In so doing, the Court
rejected the Ninth Circuit's "possibility of irreparable harm"
test, noting that "[i]ssuing a preliminary injunction based only
on a possibility of irreparable harm is inconsistent with our
characterization of injunctive relief as an extraordinary rem-
edy that may only be awarded upon a clear showing that the
plaintiff is entitled to such relief." *Id.* at 375- 76. Defendants
allege that the district court failed to apply the requisite "like-
lihood of harm" standard and relied instead on a possibility of
harm. We disagree.

**[14]** The district court correctly found that Plaintiffs will
likely succeed in proving that Defendants breached their fidu-
ciary duties under ERISA. The district court therefore also
correctly found that Plaintiffs will likely succeed in proving
that the indemnification agreements are void under section
410(a) of ERISA because they exculpate Defendants from
their fiduciary obligations. Consequently, there is more than
a possibility that Defendants will be required to reimburse
TEOHC for any advanced defense costs—there is at least a
likelihood.

**[15]** Similarly, there is a likelihood that Defendants will not
have the resources to reimburse TEOHC if defense costs are
advanced. Plaintiffs are not required to submit detailed finan-
cial statements in support of this assertion. Rather, it is
enough that Couturier himself alleged that Defendants even
now would not be able to pay their legal bills without
advancement of funds. Moreover, Defendants have already
expended the $5 million in D&O insurance coverage previ-

ously available to defend this suit, are represented by multiple attorneys raising a vigorous defense, and are facing a potential judgment in the tens of millions of dollars if found to have breached their fiduciary duties. Nor have Defendants submitted any financial data demonstrating that they will be able to reimburse TEOHC if a judgment is rendered against them. Thus, the district court did not abuse its discretion in finding that Plaintiffs established a likelihood of irreparable harm if injunctive relief were denied.

**3**

[16] The balance of equities tips in Plaintiffs' favor. Admittedly, if the preliminary injunction is upheld, Defendants will be forced either: (1) to find a way to pay for their own defense and seek recovery after trial; (2) to find attorneys willing to accept the risk of payment after trial; (3) to continue litigation without representation; or (4) to settle. We recognize that these options are accompanied by real and difficult consequences for each Defendant. Nonetheless, any such consequences are outweighed by the potential hardship to Plaintiffs if advanced defense costs are not reimbursed.

[17] If, as is likely, Defendants are found to have violated their fiduciary obligations under ERISA, section 410(a) renders their indemnification agreements void and they are not entitled to advancement of defense costs. Even if that were not the case, Plaintiffs are willing to place the potential defense costs in escrow; if they do so, Defendants will ultimately be able to recover their costs if so entitled. By contrast, as explained above, recovery by Plaintiffs of any advanced defense costs seems remote, a result that would leave ESOP participants without the benefits whose security ERISA strives above all else to protect.

**4**

[18] "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in

employing the extraordinary remedy of injunction." *Winter*, 129 S. Ct. at 376- 77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Defendants invoke the public interest in ensuring that talented individuals remain willing to serve as corporate directors and officers. But this concern, while significant, is far outweighed by the interests that ERISA protects. In enacting ERISA, Congress noted:

> that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; . . . that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

29 U.S.C. § 1001(a). In order for ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983), Congress chose to hold plan fiduciaries to a high standard—in fact, "the highest known to the law." *Howard*, 100 F.3d at 1488 (quotation omitted). Congress also chose to

render void any agreement that would exculpate a fiduciary from responsibility for a breach of that standard. 29 U.S.C. § 1110(a). Accordingly, the public interest here favors upholding the preliminary injunction barring advancement of defense costs by TEOHC.

**B**

We also reject the numerous additional arguments through which Defendants attempt to invalidate this preliminary injunction. Defendants attack the preliminary injunction as based on insufficient evidence, as failing to give due deference to the arbitration order, as improper under Supreme Court precedent, as impermissibly granting relief of a different character than any judgment that might finally issue, and as improperly imposing a constructive trust. None of these arguments has merit.

**1**

[19] Defendants first allege that the district court failed to rely on "credible and admissible" evidence in granting the preliminary injunction. *See, e.g.*, *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (finding an insufficient showing of irreparable harm in part because submitted "affidavits [from plaintiff's own executives] are conclusory and without sufficient support in facts"). They object in particular to the district court's reliance on the interested declaration of Plaintiffs' counsel and unverified client complaints.

A district court may, however, consider hearsay in deciding whether to issue a preliminary injunction. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). More-

over, the district court in the instant case relied not only on the challenged evidence but also on "the many exhibits, affidavits, declarations and factual allegations which have been submitted . . . by all parties . . . throughout the course of this litigation."[10] The district court thus did not abuse its discretion on this basis.

**2**

[20] Defendants argue that the preliminary injunction cannot be reconciled with the arbitrator's finding that TEOHC is contractually obligated to advance defense costs. In particular, they cite the strong federal policy in favor of arbitration, as well as the statutory provision that limits the venue where a party may seek to enforce or vacate an arbitral award to the district court where the arbitration occurred (here, the Northern District of California). However, the district court correctly found that Plaintiffs are not bound by the indemnification agreements or the arbitral decision, being a party to neither. As we noted in *IT Corp. v. General American Life Insurance Co.*, "a fiduciary's contract with an employer cannot get it off the hook with the employees who participate in the ERISA plan. They did not sign a contract exonerating the fiduciary." 107 F.3d at 1418. Similarly, the Federal Arbitration Act "does not require parties to arbitrate when they have not agreed to do so." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) (quotation omitted). Moreover, Defendants have not asserted any alternative contract or agency principles which may bind a nonsignatory to an arbitration agreement. *See Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006).

---

[10]Notably, this evidence includes an admission by Couturier that between 2001 and 2004, he became "entitled . . . to receive between 33% to 40% of the value of N&NW." It seems untenable that ERISA fiduciaries acting in an ESOP's best interests would, first, determine their own compensation and, second, award such a large percentage of the company, and indirectly of the ESOP's assets, to one individual.

**3**

**[21]** Defendants next argue that the preliminary injunction is improper under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, in which the Supreme Court held that the district court lacked authority "to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed." 527 U.S. 308, 310, 333 (1999). However, by its very terms, the holding of *Grupo Mexicano* is limited to cases in which only monetary damages are sought. The Supreme Court expressly stated that a preliminary injunction barring asset transfer is available where the suit seeks equitable relief. *Id.* at 324- 25 (distinguishing *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)); *see also Rubin v. Pringle* (*In re Focus Media Inc.*), 387 F.3d 1077, 1085 (9th Cir. 2004) ("*Grupo Mexicano* thus exempts from its proscription against preliminary injunctions freezing assets[,] cases involving bankruptcy and fraudulent conveyances, and cases in which equitable relief is sought."). Plaintiffs here seek equitable relief pursuant to section 409(a), 29 U.S.C. § 1109(a), and section 502(a)(3), 29 U.S.C. § 1132(a)(3), of ERISA. Accordingly, the preliminary injunction barring advancement of defense costs by TEOHC is not improper under *Grupo Mexicano*.

**4**

**[22]** Relying on *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212 (1945), Defendants also assert that a preliminary injunction may only grant relief of the same character as the judgment that may finally issue. Because the injunction here prevents advancement of TEOHC assets but Plaintiffs ultimately seek to recover funds held by Couturier, Defendants argue that the preliminary injunction is impermissible due to its difference in character from the final relief sought. But in *De Beers*, the district court's only power under antitrust law was to restrain future anticompetitive action—it was without jurisdiction to enter a monetary judgment at any

stage of the proceedings. 325 U.S. at 219- 20; *see also Hilao v. Estate of Marcos* (*In re Estate of Marcos, Human Rights Litig.*), 25 F.3d 1467, 1478 (9th Cir. 1994) ("The preliminary injunction was inappropriate [in *De Beers*] not because the plaintiff was seeking money damages . . . the injunction was inappropriate precisely because the plaintiff could *not* recover any money damages." (quotation omitted) (alteration in original)).

Here, by contrast, the district court has jurisdiction under ERISA to impose a constructive trust over any assets in Defendants' possession it concludes rightfully belong to the ESOP. 29 U.S.C. § 1109(a); *see also Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Murdock*, 861 F.2d 1406, 1412 & n.10 (9th Cir. 1988). Furthermore, if TEOHC is allowed to advance funds to Couturier, Plaintiffs will undoubtedly seek their recovery also as part of the final judgment. As this is not a case where the preliminary injunction "deals with a matter lying wholly outside the issues in the suit," *De Beers*, 325 U.S. at 220, Defendants' argument fails.

**5**

**[23]** Finally, Johanson argues that Plaintiffs cannot establish his liability under ERISA because they cannot identify specific funds or property in his possession over which they seek to impose a constructive trust. Be that as it may, in addition to imposing a constructive trust, Plaintiffs seek also to hold Johanson jointly and severally liable for all ESOP losses related to Defendants' misconduct. Accordingly, this argument, too, lacks merit.

**V**

In granting the second preliminary injunction freezing Couturier's assets and requiring an accounting, the district court applied an alternative analytical framework and found "that there are serious questions on the merits and the balance of

hardship tips sharply in favor of plaintiff." In this respect, Couturier challenges only the district court's failure to consider the element of irreparable harm. Although the validity of the district court's approach is questionable post-*Winters*, we conclude that the district court did not abuse its discretion. The court's analysis implicitly supports a likelihood of irreparable harm to Plaintiffs in the absence of injunctive relief.

**[24]** A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.[11] *See, e.g.*, *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 881 (9th Cir. 2003). As already explained, Plaintiffs have established that they are likely to succeed in proving that Couturier impermissibly awarded himself tens of millions of dollars in compensation—in Couturier's own words, "33% to 40% of the value" of the company's stock—in contravention of the highest fiduciary duties known to the law.[12] Thus, in the mere five years that he served as CEO, Couturier somehow convinced his fellow directors and trustees to consent to

---

[11]This standard was previously rejected by the Ninth Circuit in *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th Cir. 1989) ("The district court held that '[b]ecause an asset freeze is such a drastic provisional remedy, this court is of the opinion that *likelihood* of dissipation of assets is a prerequisite.' We believe it was error to require this more stringent standard. So long as the district court continued to believe that FSLIC was likely to succeed on the merits, the court should only have required FSLIC to show a possibility of dissipation of assets." (citation omitted) (alteration in original)). However, because *Winters* requires a likelihood of irreparable harm, this aspect of the *Sahni* decision is overruled.

[12]Couturier claims that comparison of the first and second preliminary injunction orders reveals that the district court altered its assessment of the strength of Plaintiffs' ERISA claims. Specifically, the district court spoke of a "likelihood" of success on the merits when it issued the first injunction, but only of a "fair chance" of success when it issued the second injunction. In freezing Couturier's assets, however, the district court specifically relied on its first order in finding that Plaintiffs have "at least a 'fair chance of success on the merits.' " Thus, the court did not change its assessment, but merely tailored its language to the standard it employed.

diverting nearly $35 million from the ESOP into his personal bank account. Such an individual is presumably more than capable of placing assets in his personal possession beyond the reach of a judgment. Accordingly, Couturier's own prior conduct establishes a likelihood that in the absence of an asset freeze and accounting, Plaintiffs will not be able to recover the improperly diverted funds and will thus be irreparably harmed. *See, e.g.*, *In re Focus Media Inc.*, 387 F.3d at 1086 (finding "the specter of irreparable harm" in part because of "evidence in the record that in the past [the defendant] made away with [the bankrupt company's] funds"); *Conn. Gen.*, 321 F.3d at 881 (concluding that the district court did not clearly err in finding a likelihood of dissipation given the defendants' "history of fraudulent intra-family transfers, their refusal to disclose asset information in defiance of court order and their convenient divorce settlement"); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236- 37 (9th Cir. 1999) (concluding that the district court did not clearly err in finding a likelihood of dissipation "[g]iven the [defendants'] history of spiriting their commissions away to a Cook Islands trust").

[25] Couturier argues also that the district court erroneously found that he would not be harmed by an asset freeze. The district court in fact concluded that a narrowly tailored asset freeze would prejudice Couturier less than a denial of relief would prejudice Plaintiffs. In that context, the court found that any prejudice to Couturier would be substantially mitigated by limiting the injunction to permit Couturier "to cover normal living expenses and legal fees" and by allowing Couturier to petition the court at any time for consent to an asset transfer or disposal. Given that the freeze on Couturier's assets is limited to those in which Plaintiffs have an equitable interest and does not extend to normal living expenses and legal fees, the district court correctly balanced the relative hardships. *See Marcos*, 862 F.2d at 1362 (finding no hardship where an asset freeze does not extend to normal living expenses and legal fees).

Nor does Couturier's "the-sky-is-falling" resort to *De Beers* have any merit. Couturier would have us believe that "[n]o relief of this character has been thought justified in the long history of equity jurisprudence." *De Beers*, 325 U.S. at 223. But as discussed above, the district court in *De Beers* lacked authority to enter a monetary judgment, thus rendering an asset freeze to ensure compliance with any final injunctive relief impermissible. *Id.* at 219- 20. In fact, the Supreme Court expressly differentiated the situation where an injunction freezes "a fund or property which would have been the subject of the provisions of any final decree." *Id.* at 220. *De Beers* is thus inapposite here. *See generally Hilao*, 25 F.3d at 1477- 78.

## VI

Federal Rule of Civil Procedure 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite the seemingly mandatory language, "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any.*'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.* We review for abuse of discretion a district court's determination as to the amount and appropriateness of the security required by Rule 65(c). *Barahona-Gomez*, 167 F.3d at 1237.

**[26]** The district court ordered Plaintiffs to post $5000 as security for each temporary restraining order preceding the corresponding preliminary injunction. Although Plaintiffs have since stated that these cash bonds remain with the Clerk of Court as security for the preliminary injunctions, the dis-

trict court did not itself address the sufficiency of the bond amounts except in the context of issuing the temporary restraining orders. We remand the question of bond sufficiency to the district court, which should set the terms and conditions of a surety bond for each preliminary injunction. The court may wish to take into account Plaintiffs' offer to place in escrow potential defense costs, an offer which if accepted would itself ensure that Defendants' expenses will be reimbursed if either preliminary injunction is ultimately found to have been granted in error.

## VII

We conclude that ERISA establishes federal subject matter jurisdiction over this case and that state law governing advancement of defense costs is here preempted as its application would conflict with ERISA. We further conclude that the district court did not abuse its discretion in preliminarily enjoining TEOHC from advancing defense costs, nor in freezing Couturier's assets and requiring an accounting. Finally, because it did not consider the question in the first instance, we remand the question of bond sufficiency to the district court.

Costs on appeal are awarded to Plaintiffs-Appellees.

**AFFIRMED but REMANDED with instructions.**