Filed 7/30/13  Snelling Services v. Diamond Staffing Services CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SNELLING SERVICES, LLC,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DIAMOND STAFFING SERVICES, INC.,<br>ROD SANTORO,<br><br>        Defendants and Appellants. | A135049<br><br>(Alameda County<br>Super. Ct. No. RG12618214) |

**INTRODUCTION**

Defendants Diamond Staffing Services, Inc. (Diamond) and Rod Santoro appeal from a preliminary injunction in favor of plaintiff Snelling Services, LLC (Snelling), on Snelling's causes of action for unfair competition and misappropriation of trade secrets against defendants.  The injunction issued upon the court's finding that Snelling was likely to prevail on the merits of its claims for unfair competition and misappropriation of trade secrets and that Snelling would suffer greater harm if the injunction were not issued than defendants would if the injunction issued.

The preliminary injunction (1) prohibits defendants from directly or indirectly using, disclosing or acquiring Snelling's trade secrets or confidential information, including but not limited to, confidential customer lists, customer information, pricing and other specified information related to Snelling's business operations, strategies,

1

finances or plans, whether based on actual documents or memory of such information; (2) prohibits defendants from allowing any former Snelling employee whom Diamond now employs from soliciting any Snelling customer with whom they worked or for whom they provided any services of any kind while employed by Snelling; (3) prohibits Santoro from soliciting any Snelling employee for employment with Diamond in contravention of his employment agreement with Snelling; (4) prohibits Santoro from providing any services, directly or indirectly, to any customer or account to which he was assigned or for which he was responsible for approving pricing while employed by Snelling, insofar as any such services are based in any way on his use or disclosure of Snelling's trade secrets.

Defendants contend:

(1) The trial court abused its discretion in enjoining Santoro from soliciting Snelling employees in contravention of his employment agreement where: (a) it did not find Snelling was likely to prevail on its breach of contract action; (b) Snelling cannot succeed on that cause of action as the restrictive covenant is unenforceable; and (c) undisputed evidence establishes Santoro did not solicit any Snelling employees.

(2) The trial court abused its discretion in issuing the injunction based on its finding Snelling was likely to prevail on its trade secret claim where: (a) customer names, prices and markups charged by Snelling and employee compensation were not trade secrets as a matter of law, and (b) uncontradicted evidence showed none of Snelling's former employees misappropriated Snelling's trade secrets.

(3) The trial court abused its discretion in finding Snelling likely to prevail on its unfair competition cause of action because (a) the California Uniform Trade Secrets Act (CUTSA or UTSA) (Civ. Code, § 3426 et seq.)[1] preempts Snelling's unfair competition claim which is founded on the same nucleus of facts underlying the trade secret misappropriation claim, and (b) Snelling is unlikely to prevail on its CUTSA claim.

_____

[1] All statutory references are to the Civil Code, unless otherwise indicated.

(4) The preliminary injunction is procedurally defective, overbroad, vague and ambiguous.

(5) The trial court erred in denying defendants' motion to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

Snelling is a temporary staffing company with offices in Hayward, Milpitas, and throughout the United States. Diamond is a competitor of Snelling. Santoro worked for Snelling from June 1999 until January 5, 2012, most recently as Snelling's regional vice president. In that role, Santoro supervised and managed all of Snelling's company-owned California offices and several onsite locations from time to time, including Costa Mesa, Hayward, Milpitas, Ontario and Tracy. He had access to employee lists, confidential customer lists, customer pricing lists and all client data entered into Snelling's software system. He also had knowledge of and access to Snelling salary and personnel information for Snelling employees.

As a condition of his employment with Snelling, Santoro signed an employment agreement that provided that "for a period of 12 months following termination," he would not "without the prior written consent of SNELLING, either directly or indirectly . . . solicit or divert or hire away, or attempt to solicit, divert or hire away, to any competing business, any person employed by SNELLING . . . ."

Santoro was terminated on January 5, 2012. At that time, Snelling's Milpitas office employed three people and its Hayward office employed five. On February 6, 2012, Santoro joined Diamond as its vice president of business development for Northern California. Between February 8 and March 1, Santoro hired nearly the entire Snelling staff from its Milpitas and Hayward offices for Diamond. During this three-week period, seven former Snelling employees out of a total of eight then current Snelling general managers and key salespersons abruptly resigned from its Milpitas and Hayward offices and immediately joined Diamond. Until February 6, 2012, Diamond had no Northern California office. Its office is now comprised primarily of former Snelling employees with whom Santoro worked. Virtually overnight, Diamond opened an office in Hayward. It appears that neither Santoro nor Diamond employees (formerly Snelling employees)

did anything to independently source the identities of the key contacts responsible for temporary staffing needs at the companies they targeted. They relied primarily on their previous access to these key contacts obtained through their employment with Snelling.

Although Santoro testified he did not begin employment with Diamond or do any work on Diamond's behalf until February 6, 2012, except for taking a trip to Southern California, evidence was produced showing that he took many active steps before that date to benefit Diamond, including looking for office space for Diamond's Hayward office and preparing offer letters for Diamond's "Bay Area Team," comprised solely of former Snelling employees. Santoro claimed he prepared these offer letters before speaking with most or all of the target employees.

In late January or early February 2012, Santoro also developed and authored a five-page, single-spaced typewritten document entitled, "Diamond Expansion," for the benefit of Diamond's president of sales, Frank Vaccaro. The "Plan," as Santoro referred to it, detailed a plan to hire away Snelling's key employees to effectively take away Snelling's Northern California business.[2] The document includes a timeline of events, with separate and distinct phases during which Santoro and Diamond would systematically capture Snelling's business in different geographical regions. Hiring Snelling's key managers was central to defendants' plan. The Plan set forth the salary information for key Snelling employees and a step-by-step strategy as to how Snelling's business would be "converted" to Diamond. (The Plan also included dates in the near future for extending the conversion process to Snelling's Central Valley and Southern California business.) Santoro gave the Plan to Vaccaro with instructions as to how to immediately execute it. Emails produced with the Plan during discovery showed Santoro met with Snelling employees while they were still employed by Snelling to begin to implement the Plan.

Santoro shared Snelling's admittedly confidential customer pricing and markup and annual revenue information with Vaccaro. Santoro created a detailed chart, allegedly

---

[2] The record before us contains "The Plan," which was filed under seal and accompanies the appellants' opening brief.

4

from memory, of 70 Snelling customers, along with each customer's "estimated annual spend" and "estimated mark-up" at Snelling, and shared this information with Vaccaro to provide him with an estimate of how much business Diamond could plan to take from Snelling. Santoro acknowledged that such pricing information was confidential and was not something either Snelling or Diamond would disclose to a competitor. Other emails produced by defendants showed that after being hired by Diamond, the former Snelling employees initiated contact with Snelling customers on behalf of Diamond and attempted to capitalize on their previous relationships with these customers. The first phase of the Plan was extraordinarily successful, as indicated by evidence that Snelling lost "essentially its entire management staff" for the Milpitas and Hayward offices to Diamond. Nearly all of Diamond's workforce in the Milpitas-Hayward region is comprised of former Snelling employees and many of the Snelling customers on the list prepared by Santoro migrated to Diamond.[3] Clients contacted Snelling requesting Snelling to reprice existing contracts, as Diamond was offering to perform the same work for them at a lower price.

On February 23, 2012, Snelling filed its original complaint against Santoro and Diamond. It filed a first amended complaint and on March 13, 2012, filed the operative second amended complaint. Among other things, the second amended complaint alleged causes of action for misappropriation of trade secrets in violation of CUTSA (§ 3426) and unfair competition under Business and Professions Code section 17200 et seq. against both Santoro and Diamond.[4]

---

[3] Snelling states 99 percent of Diamond's Northern California customers were Snelling customers before implementation of the Plan. However, the cited portions of the record indicate Santoro testified that 99 percent of the customers *on the list he prepared for Diamond* were Snelling customers at the time, not that 99 percent of them migrated to Diamond, although many did.

[4] The second amended complaint also alleged breach of the employment contract, and breach of the covenant of good faith and fair dealing against Santoro as well as intentional interference with contractual relations and intentional interference with prospective economic advantage against both defendants.

On March 2, 2012, defendants filed their cross-complaint for declaratory and injunctive relief, restitution, and damages against Snelling.  Defendants also moved to compel arbitration under Santoro's employment agreement.  On March 5, the trial court granted in part and denied in part defendants' ex parte application for a stay of proceedings pending disposition of their petition to compel arbitration.  The court severed "any aspect of this case relating to wrongful termination" and stayed any wrongful termination claims brought by Santoro, with the exception of proceedings necessary to determine the then pending petition to compel arbitration (see § 1281.4).  The court denied defendants' requests for a temporary restraining order (TRO).  The court also granted Snelling's ex parte application for a TRO and to conduct expedited discovery.

On March 28, 2012, following a hearing, the trial court issued orders granting Snelling's motion for a preliminary injunction and denying defendants' motion to compel arbitration.  In so doing, the court found that "(1) the customer lists, profit sheets, pricing/mark-up percentages, etc. constitute protectable 'trade secrets' and/or confidential information, (2) there is a likelihood that Defendants have improperly accessed, used and/or disclosed the 'trade secrets' and/or confidential information of Snelling to unfairly compete with Snelling, (3) there is a likelihood that Defendants have used 'trade secrets' and/or confidential information to improperly and unfairly solicit and/or hire former Snelling employees for an unlawful purpose because the departure of many key managers is contemporaneous with them accessing and/or downloading 'trade secrets' and/or 'confidential' information, and (4) Snelling has and will continue to suffer harm if Defendants are not enjoined from using Snelling's 'trade secrets,' and 'confidential information,' and soliciting Snelling employees and otherwise unfairly competing with Snelling."

The preliminary injunction restrained and enjoined Diamond, Santoro and Diamonds' officers, employees and agents as follows:

"1.     Defendants shall not directly or indirectly use, disclose, or acquire, or attempt to use, disclose, or acquire any of Snelling's trade secrets or Confidential Information as that term is defined in Defendant Santoro's Employment Agreement with

6

Snelling and otherwise, including, but not limited to, confidential customer lists or confidential customer information, including key contact identities or information relating to customers' specific needs or past purchasing tendencies, confidential pricing strategies and pricing information, profit and loss statements, business plans, financial information, Snelling Weekly Revenue spreadsheets, customer revenue reports, weekly revenue budgets, detailed customer work reports, confidential information relating to Snelling's sales pipeline and sales and marketing strategies, pricing and cost codes, mark-up information, marketing techniques, strategic business plans and market research studies, operating reports, and any other information related to Snelling's business operations, strategies, finances or plans (collectively referred to as 'Snelling's Trade Secrets') whether based on actual documents containing such information or memory of such information.

"2.     Defendants shall refrain from allowing any former Snelling employee who Defendant Diamond now employs from soliciting any Snelling customer with whom they worked . . . or provided any services of any kind while employed by Snelling.

"3.     Defendant Santoro shall not solicit any Snelling employee for employment with Defendant Diamond in contravention of his Employment Agreement with Snelling.

"4.     Defendant Santoro shall not provide any services, directly or indirectly, to any customer or account to which he was assigned, or was responsible for approving pricing for, while employed by Snelling, insofar as any such services are based in any way on his use or disclosure of Snelling's Trade Secrets."

The court also ordered the parties to refrain from altering or destroying any evidence potentially relevant to the issues raised in Snelling's second amended complaint or any operative pleading, including defendants' cross-complaint.

On April 2, 2012, Snelling posted the $50,000 bond required by the court to effectuate the preliminary injunction. That same day, defendants filed a notice of appeal of the March 28, 2012 orders granting the preliminary injunction and denying defendants' motion to compel arbitration. Thereafter, defendants filed a petition for writ of mandate or in the alternative for an order expediting the appeal, together with a stay

7

request, which we denied.  On July 12, 2012, we granted defendants' motion to seal portions of the record and their motion for calendar preference.

## DISCUSSION

### I.  Standard of Review

"We review an order granting a preliminary injunction, under an abuse of discretion standard, to determine whether the trial court abused its discretion in evaluating the two interrelated factors pertinent to issuance of a preliminary injunction— (1) the likelihood that the plaintiff[] will prevail on the merits at trial, and (2) the interim harm that the plaintiff [is] likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued. [Citation.]  Abuse of discretion as to either factor warrants reversal.  [Citation.]

"Where the likelihood of prevailing on the merits depends upon a question of law such as statutory construction, the question on appeal is whether the trial court correctly interpreted and applied the law, which we review de novo.  (*Strategix, Ltd. v. Infocrossing West, Inc.* (2006) 142 Cal.App.4th 1068, 1072 (*Strategix*).)

" 'In determining the validity of the injunction, we look at the evidence presented to the trial court to determine if there was substantial support for the trial court's determination that the plaintiff was entitled to the relief granted.' [Citation.]  'Where the evidence before the trial court was in conflict, we do not reweigh it or determine the credibility of witnesses on appeal. "[T]he trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts." [Citation.]  Our task is to ensure that the trial court's factual determinations, whether express or implied, are supported by substantial evidence. [Citation.] Thus, we interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order. [Citations.]' [Citations.]" (*Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1299-1300; see *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1016 (*ReadyLink*); *Hilb, Rogal & Hamilton Ins. Services v. Robb* (1995) 33 Cal.App.4th 1812, 1819-1820 (*Hilb*).)

8

One other well-established standard of review warrants mention.  The rule is that, subject to certain exceptions, appellate courts will not review the *reasons* for the trial court's decision.  Stated otherwise, a judgment or order *correct on any theory* will be affirmed, even though the trial court's reasoning may have been erroneous.  (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶¶ 8:214-8:217.)  Throughout their appellants' reply brief, defendants contend, citing *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1050, that "[a] discretionary order that rests on an erroneous legal conclusion is error, without regard to whether such an order might on other grounds have been proper."  However, *Brinker* involved one of the recognized exceptions to the rule—a class action certification. (*Id.* at p. 1050 ["A grant or denial of class certification that rests in part on an erroneous legal assumption is error; without regard to whether such a certification might on other grounds be proper, it cannot stand. [Citation.]."][5]  The general rule applies to this case.  We do not review the court's reasons, but will affirm so long as issuance of the preliminary injunction was correct on any theory.

## II.  Employee Solicitation Prohibition

Paragraph 3 of the injunction states: "3.   Defendant Santoro shall not solicit any Snelling employee for employment with Defendant Diamond in contravention of his Employment Agreement with Snelling."[6]

### A.  *Employment Agreement*

Defendants contend this portion of the injunction prohibiting Santoro from soliciting Snelling's employees must be vacated.  They argue that the court abused its

[5] Other exceptions to the general rule include orders granting new trials, nonsuit orders, or statements of decision revealing gender bias.  (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra,* ¶¶ 8:218-8:225.1.)

[6] The employment agreement provided: "7)  You agree that during Your employment by SNELLING and for a period of 12 months following termination, for whatever reason. You will not without the prior written consent of SNELLING, either directly or indirectly: [¶] . . . [¶] c) Solicit or divert or hire away, or attempt to solicit, divert or hire away, to any competing business, any person employed by SNELLING, whether or not such employee is a full time employee or a temporary employee . . . ."

9

discretion in prohibiting Santoro from soliciting Snelling employees in contravention of his employment agreement where it failed to find that Snelling was likely to prevail on its breach of contract claim. Defendants further contend Snelling cannot prevail on its contract claim because the restrictive covenant of that agreement, barring Santoro from working for a competitor, soliciting Snelling's customers, and soliciting or hiring Snelling's employees is unenforceable as a violation of Business and Professions Code section 16600, which provides, "every contract by which anyone is restrained from engaging in a lawful trade, business or profession . . . of any kind is to that extent void," subject to statutory exceptions not relevant here. (See *Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 407-408; *Strategix, supra,* 142 Cal.App.4th 1068, 1070-1074.)

Snelling responds that the enforceability of the employment agreement provision prohibiting Santoro from soliciting or hiring away Snelling employees for 12 months following his termination is not at issue here. The court did not address the question of the likelihood of either party to prevail on the breach of contract claims. Rather, it issued the injunction based on its determination that "Snelling has established with sufficient evidence a likelihood of prevailing on the unfair competition and misappropriation of trade secrets claims alleged in the operative complaint and that it will suffer greater harm than Defendants should the injunction not issue." Although the court used the phrase "in violation of his employment agreement" in the injunction, such language can be read as limiting the period of injunctive relief to 12 months from the date of Snelling's termination on January 5, 2012, rather than indefinitely. In assessing the validity of this injunctive provision, we do not consider the employment agreement or its nonsolicitation provision, as such restrictions are generally void under Business and Professions Code section 16600. (*Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859 (*Metro Traffic*).)

**B.** *The Law*

Competitors may solicit each other's employees, provided they do not use unlawful means or engage in acts of unfair competition. (*VL Systems, Inc. v. Unisen, Inc.* (2007) 152 Cal.App.4th 708, 713; *Metro Traffic, supra,* 22 Cal.App.4th at p 860; Chin et

10

al., Cal. Practice Guide: Employment Litigation (2013) ¶ 14:395  (Chin, Employment Litigation).[7]  The corollary of the rule is that a competitor may not solicit the employees of another for an unlawful purpose or through unlawful means.  (*Metro Traffic, supra,* 22 Cal.App.4th at p. 860; Chin, Employment Litigation, at ¶¶ 14:398-14:401.)  "Offering employment to a competitor's key employees *for the purpose of stealing customers* who have established relationships with those employees may be actionable. [Citation.]" (Chin, Employment Litigation, at [¶] 14:399, citing *Metro Traffic* and noting such facts were not shown in that case.)

In *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 351-352 (*Bancroft-Whitney*), the California Supreme Court held that an unpublished list of salaries paid by a corporation to its employees was considered confidential information and that a corporate officer violated his trust by revealing that information to a competitor for the purpose of enabling the solicitation of the corporation's employees by the competitor, stating:  "The salaries paid by a corporation to its employees are not matters of common knowledge and, even among corporation employees, they are divulged only to those persons or organizations directly concerned with personnel matters or to responsible fiduciaries." (*Id*. at p. 351.)  The Supreme Court rejected the claim that the salary information was not confidential because the employees could have revealed their own salaries to the competitor corporation or to anyone else.  "It requires little talent to distinguish between

---

[7] " 'California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice.  [Business and Professions Code s]ection 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the employer's trade secrets.  [Citation.]  The corollary to this proposition is that [a competitor] may solicit another's employees if they do not use unlawful means or engage in acts of unfair competition.' ([*Metro Traffic, supra,*] 22 Cal.App.4th 853, 859.)

"Indeed, 'no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action. [Citations.]' [Citation.]" (*VL Systems, Inc. v. Unisen, Inc.*, *supra,*152 Cal.App.4th at p. 713.)

a situation in which an individual voluntarily discloses his own salary to another and one in which the unpublished salary list of a group of prospective employees is revealed to a competitor for the purpose of facilitating the recruitment of the corporation's personnel." (*Id.* at p. 352.)

Nor does a former employee's right to compete with his or her former employer include the right to use the former employer's trade secrets. (*Courtesy Temporary Service, Inc. v. Camacho* (1990) 222 Cal.App.3d 1278, 1291 (*Courtesy*); see *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1520 (*Morlife*); *ReadyLink, supra,* 126 Cal.App.4th at p. 1019; Chin, Employment Litigation, *supra,* ¶¶ 14:400-14:401, 14:490.)

In *Courtesy, supra,* 222 Cal.App.3d 1278, former employees of a temporary employment agency acquired confidential knowledge regarding the agency's customers and its labor force, including the temporary employees' names, addresses, job skills, and past employment history. Using this information, which was protectable as a trade secret, former employees set up a competing business. The trial court issued a preliminary injunction restraining the employees from soliciting or utilizing the agency's employees, but found the agency's confidential customer list and related information was not protected. (*Id.* at p. 1285.) The Court of Appeal affirmed that part of the court order enjoining solicitation of the agency's employees and reversed that portion of the trial court order refusing to enjoin employees from using the agency's customer list and related information. (*Id.* at pp. 1281, 1292.) The appellate court concluded the customer list was a protectable trade secret under the CUTSA and unfair competition statutes. (*Courtesy*, at p. 1288; see *ReadyLink, supra,* 126 Cal.App.4th at pp. 1020-1021.) *Courtesy* concluded that 'even if Courtesy's customer list would not qualify as a "trade secret' under section 3426.1, the unfair and deceptive practices of employees in stealing Courtesy's customers should have been enjoined under Business and Professions Code section 17200 et seq." (*Courtesy,* at p. 1291.) " '[A] former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition. [Citation.]' (*Courtesy*[, at p.] 1292.)" (*ReadyLink,* at p. 1021.)

12

## C. *Santoro's Solicitation of Snelling Employees*

Defendants contend that uncontradicted evidence showed that Santoro did not solicit any Snelling employees while employed by Snelling or thereafter. Declarations filed by Santoro and by former Snelling employees who were hired by Diamond uniformly stated that Santoro did not solicit them to leave Snelling and join Diamond. Rather, when the employees (Veronica Martinez, former general manager of the Hayward office, Jeff Barthold, former general manager of Snelling's Milpitas office, and five others[8]) learned from Bill Hamrick, Snelling's senior vice president of operations on February 3, 2012, or from others, that Santoro had accepted employment with Diamond, they each contacted Santoro and asked whether they could join him at Diamond. The former Snelling employees stated Diamond instructed them not to bring any Snelling materials to Diamond and that they did not bring any Snelling materials to Diamond.

However, the court need not have fully credited these declarations in the face of evidence of the Plan, which Santoro admitted was created as early as January 2012, and which set forth in great detail his plan to hire Snelling employees for the purpose of "converting" Snelling's Northern California business to Diamond. The Plan listed each of the Snelling employees who later left Snelling for Diamond, along with their position and compensation information; a "proposed timeline" including dates beginning on February 6, to "[f]inalize hire and start of all Phase 1 Staff" so as to "initiate the conversion conversations with all clients currently being supported. No staff will remain at prior organization to support client needs and relationships are strong and reliable." The hiring timeline for four of the managers was listed as February 6 to 17, with

---

[8] These other employees included: Jay Guittard, business development manager for Snelling's Hayward, Milpitas and Tracy offices; Diana Diaz, Snelling's Hayward office staffing manager; Nancy Jurd, Snelling's Hayward office staffing manager; Dale Miller, Snelling's Milpitas office staffing manager; and Janeth Ramos, employed on a temporary basis as a staffing manager at Snelling.

13

initiation of client contact beginning the week of the 6th. Staff conversion was to conclude by March 1, 2012.[9]

A February 3, 2012 email from Santoro to Vaccaro attached detailed offer letters to the seven Snelling employees, constituting "all of the offers for the Bay area team" for approval. It is noteworthy that this email, the offer letters, and the Plan, were all prepared by Santoro during a time period he testified he was *not* working for or on behalf of Diamond. The timing of the email from Santoro to Vaccaro indicates it was sent minutes *before* Hamrick's email notifying Snelling employees that Santoro had "landed" at Diamond. Employees Martinez, Miller, Diaz, Ramos, Guittard, Barthold and Jurd all testified in deposition and sworn declarations that each contacted Santoro about employment at Diamond *only after* receiving Hamrick's February 3 email or learning that Santoro was working at Diamond.

On February 6, the date Santoro testified he began working for Diamond, Santoro emailed Vaccaro a list of "a recap of what I remember of my past clients," including their names, annual spend and estimated mark-up percentage. In that email, he recounted that: "This week Jay resigns without notice and begins work to solidify his relationships. Veronica and Jeff were also in my plan for this week or next." Santoro sent Martinez an offer letter on February 5, the day before he claims he was hired by Diamond.

Martinez and Barthold resigned from Snelling on February 8. Martinez testified it was not until the moment she resigned that she decided to leave Snelling, that she had no job lined up when she resigned, that she did not know she would be working at Diamond the next day. However, the email evidence shows she had received her offer letter on February 5, and had met with Santoro and other Snelling employees he was recruiting on February 7. Santoro testified that as reflected in his February 3 email to Vaccaro, both

---

[9] The Plan also included a "Phase 2" to be executed in March or April 2012, in which Diamond would "[f]inalize hire and start of Phase 2 staff for inclusion on the existing Stockton, CA location. This will initiate the conversion process with Central Valley clients to the Stockton location."

14

Barthold and Martinez "appeared to be committed" to resigning from Snelling and joining Diamond.

In sum, Snelling presented evidence that the Plan to hire these particular employees was in process well before most of them claim to have initiated contact with Santoro regarding employment with Diamond, that the offer letters to the particular employees had been drafted *before* Hamrick notified employees on February 3, that Santoro had landed at Diamond (the event that most testified motivated their contacting Santoro about employment with Diamond) and days before Santoro purportedly began working at Diamond on February 6. Indeed, Santoro made the offer to Martinez the day before he claims to have begun work on behalf of Diamond. The testimony of Santoro and Martinez raise serious questions as to their credibility. The trial court does not abuse its discretion by weighing the credibility of witness testimony. (E.g., *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450, quoting *Hilb, supra,* 33 Cal.App.4th at p. 1820 [" ' "the trial court is the judge of the credibility of the affidavits filed in support of the application for preliminary injunction and it is that court's province to resolve conflicts" ' "].)

In light of this and other evidence relating to the execution of the Plan, the court could refuse to believe that Santoro did not solicit these employees and could instead rely on reasonable inferences it could draw from the Plan and the sequence of events surrounding the migration of key employees from Snelling to Diamond to determine there was a strong likelihood that Santoro and Diamond solicited key Snelling employees using confidential information and that defendants would continue to do so as set out in other phases detailed in the Plan.

### III. Trade Secrets

Defendants maintain that, *as a matter of law*, the employee compensation information as well as its customer names, prices and markups charged customers by Snelling were *not* trade secrets. We disagree.

"California's version of the UTSA defines 'trade secret' as 'information, including a . . . compilation . . . that: [¶] (1) Derives independent economic value, actual or

15

potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.' (Civ. Code, § 3426.1, subd. (d).) *Whether information is a trade secret is ordinarily a question of fact.* ([citations]; [*Morlife, supra,*] 56 Cal.App.4th 1514, 1521.)" (*San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528, 1537, fn. omitted, italics added.)

California cases have held similar types of information to be trade secrets or at least "confidential" information. (E.g., *Bancroft-Whitney Co. v. Glen, supra,* 64 Cal.2d at pp. 350-352, [an unpublished list of salaries paid by a corporation to its employees— "The salaries paid by a corporation to its employees are not matters of common knowledge and, even among corporation employees, they are divulged only to those persons or organizations directly concerned with personnel matters or to responsible fiduciaries"]; *Courtesy, supra,* 222 Cal.App.3d at pp. 1286-1292 [customer lists, billing rates and markup percentages of a temporary staffing agency]; *Morlife, supra*, 56 Cal.App.4th at p. 1522 [compiled confidential customer lists are trade secrets with independent economic value "because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested"]; *Klamath-Orleans Lumber, Inc. v. Miller* (1978) 87 Cal.App.3d 458, 465 [list of preferred customers, ascertained originally by continuous solicitation and investigation, and the specially arranged list of bonuses and charges, developed by long experience constitutes a trade secret of value]; see also *The Retirement Group v. Galante* (2009) 176 Cal.App.4th 1226, 1238 ["[n]umerous courts have concluded customer lists can qualify for trade secret protection," although in the particular case the customer list was not entitled to trade secret protection because the names and contact information for existing customers were readily available from independent third party sources].)

"[Defendant] contends that neither customer lists nor pricing methods qualify as trade secrets under California law . . . . Courts since *Fortna* [*v. Martin* (1958) 158 Cal.App.2d 634] and *American Paper* [*& Packaging Products, Inc. v. Kirgan* (1986)

16

183 Cal.App.3d 1318 (*American Paper*)] have held otherwise. See *Morlife,* [*supra*], 56 Cal.App.4th [at pp. 1521-1522] ('[W]here the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers'); See also *Whyte v. Schlage Lock Co.,* [*supra,*] 101 Cal.App.4th [at pp. 1454-1456] (trade secrets may constitute 'cost and pricing information not readily known in the industry—information such as the cost of materials, labor, overhead, and profit margins . . . .') [Citation.]" (*Lifetouch Nat. School Studios, Inc. v. Moss-Williams* (N.D. Cal., Aug. 25, 2011) No. 5:10-CV-05297 JF HRL, 2011 WL 3759940.)

The trial court found Snelling's customer names, profit sheets, prices and markups and so forth, were trade secrets or confidential information, or both. So too, in issuing the preliminary injunction, the court impliedly found employee compensation information used by defendants in preparing their offer packages to Snelling employees was either a trade secret or confidential information. That determination was supported by substantial evidence, including the following:

Beth Turner, Snelling's senior manager of network operations, filed a declaration in support of Snelling stating, among other things, that certain information Martinez and Barthold accessed shortly before they left to join Diamond, "particularly the financial data, [was] password protected from public disclosure and . . . only accessible to Snelling employees." (Although much of the Turner declaration may have been inadmissible (see pages 20-22, *post*), Turner could properly testify that various types of data was password protected and accessible only to Snelling employees. She stated she had personal knowledge of the things about which she testified and, as the senior manager of network operations, she would be expected to know about the accessibility of Snelling data.)

Santoro testified in his deposition that both Snelling and Diamond keep customer pricing "confidential," and would not disclose such information to a competitor.

17

Although Santoro described a method by which potential clients could be identified on the Internet through accessing information about persons seeking temporary staffing positions using Internet job boards and similar tools, he also testified that he did not know whether the former Snelling employees hired by Diamond did anything to "independently source" a major Snelling client solicited by Diamond.

In addition, Snelling identified this type of information as "trade secrets" and "confidential information" in its employment agreement. "While labeling information 'trade secret' or 'confidential information' does not conclusively establish that the information fits this description [citations], it is nonetheless an important factor in establishing the value which was placed on the information and that it could not be readily derived from publicly-available sources. Furthermore, 'to afford protection to the employer, the information need not be in writing but may be in the employee's memory. [Citation.]' (*Greenly v. Cooper* (1978) 77 Cal.App.3d 382, 392.)" (*Morlife, supra,* 56 Cal.App.4th at pp. 1522-1523.)

Furthermore, the parties stipulated that certain deposition testimony and documents or exhibits produced in connection with those depositions would be filed under seal and marked confidential. Consequently, the record before us contains sealed documents, including Santoro's compilation of a list of Snelling's clients, estimated annual spend and mark-up percentages and employee information including names of former Snelling staffers hired by Diamond, their job titles and compensation information.

We are not persuaded by defendants' argument that because employees can disclose their compensation to whomever they want, employee compensation is not a trade secret as a matter of law. (See Labor Code § 232.) As we observed above, the California Supreme Court rejected this argument in *Bancroft-Whitney, supra,* 64 Cal.2d at page 352. We believe the same is true with respect to the prices and markup percentages Snelling charges their customers. That a customer may be free to disclose the price it pays for services or the mark-up percentage (assuming the customer even knows the markup information), does not make it any less a trade secret. To borrow the phrasing of the Supreme Court: "It requires little talent to distinguish between a situation

18

in which an individual [potential customer or client] voluntarily discloses his own [financial information] to another and one in which the unpublished [pricing and mark-up percentages] of a group of prospective [customers or clients] is revealed to a competitor for the purpose of facilitating the recruitment of those [customers or clients]." (*Ibid.*)

The court did not abuse its discretion in concluding the employee compensation information and the client lists, estimated annual spend, markup percentages and other related information constituted trade secrets.[10]

We also note, as have other courts, that " '[o]ur decision regarding trade secret status is based upon the appellate record and is not a final adjudication on the merits. [Citations.] The ultimate determination of trade secret status is subject to proof presented at trial.' (*Whyte v. Schlage Lock Co., supra,* 101 Cal.App.4th at p. 1453.)" (*ReadyLink, supra,*126 Cal.App.4th at p. 1017.)

### IV. Substantial Evidence of Misappropriation

The trial court found "there is a likelihood that Defendants have used 'trade secrets' and/or confidential information to improperly and unfairly solicit and/or hire former Snelling employees for an unlawful purpose because the departure of many key managers is contemporaneous with them accessing and/or downloading 'trade secrets' and/or 'confidential' information and . . . Snelling has and will continue to suffer harm if Defendants are not enjoined from using Snelling's 'trade secrets,' and 'confidential information,' and soliciting Snelling employees and otherwise unfairly competing with Snelling."

Defendants argue that such finding was unsupported by substantial evidence and that the uncontradicted evidence showed no former Snelling employee misappropriated a Snelling trade secret.

---

[10] It is noteworthy that the Diamond employment agreements offered to former Snelling staffers contained similar provisions regarding "Confidentiality and Trade Secrets" and a "Noncompetition Agreement."

**A.** *Turner Declaration*

After the mass exodus of key employees to Diamond, Snelling conducted a forensic investigation, the results of which were detailed in the Turner declaration. The declaration related that in the days immediately before they left Snelling for Diamond, former employees Barthold and Martinez accessed and downloaded several confidential internal Snelling files, described in the Turner declaration and attached forensic report and that these files and the data therein were accessed at unusual times and under unusual circumstances several times before the employees' departure. Turner declared the accessed information, particularly the financial data, was password protected and accessible only to Snelling employees, that a competitor could use the information to unfairly compete with Snelling by underbidding it in competing for work and using it to gain knowledge into the types and amounts of services Snelling clients generally utilized and the price customer's paid. Turner opined, that "[g]iven the times and frequency in which Mr. Barthold and Ms. Martinez downloaded this information leading up to the last dates of their employment their conduct is highly suspect." Defendants objected to the admissibility of the Turner declaration on numerous grounds. The trial court did not rule on the objections. Martinez, Barthold, and other former Snelling employees filed declarations in opposition to the preliminary injunction motion, contradicting Turner's conclusions and otherwise explaining and justifying their actions in accessing various information and documents during the waning days of their employment with Snelling, including some of the information and documents described in the Turner declaration.

**B.** *Other Evidence of Misappropriation*

On appeal, defendants again contend Turner's declaration testimony was inadmissible and, therefore, could not be considered as evidence in support of the preliminary injunction.[11] Hence, they argue that the evidence that neither Martinez nor

---

[11] On appeal, defendants again assert:

(1) The consultant who conducted the forensic examination did not authenticate his report, making that report inadmissible (Evid. Code, § 1401) and Turner was not

20

Barthold (nor any other former Snelling employee) misappropriated any Snelling trade secret is uncontradicted.

Because a preliminary injunction is a "motion" procedure, proof of facts is ordinarily made by declaration or affidavit. (Code Civ. Proc., § 2009; see Weil et al., Civil Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 9:574, p. 9(II)-22.) "Affidavits and declarations must state *evidentiary* facts. This requires facts showing the affiant's or declarant's *personal knowledge* of whatever other matters are contained. Conclusions and opinions may be used only to the extent that a witness may use them in testifying in person. Hearsay is inadmissible unless an appropriate hearsay exception applies. The foundation for documents must be set forth." (Weil et al., Civil Procedure Before Trial, at ¶ 9:576, p. 9(II)-22; see generally, *Tuchscher, supra,* 106 Cal.App.4th at p. 1238; *Ancora-Citronelle Corp. v. Green* (1974) 41 Cal.App.3d 146, 150.)[12]

_____

competent to authenticate someone else's report (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1238 (*Tuchscher*)).

(2) The report consists of inadmissible hearsay as the documents it purports to describe are not attached to the report or to the Turner declaration. (Evid. Code, § 1200, subd. (b).)

(3) Turner did not establish she was competent to interpret the report.

(4) Although she stated she was "familiar" with the documents referenced in the report, she did not state any evidentiary facts establishing she had personal knowledge of what was in the documents.

(5) Turner did not state any evidentiary facts establishing she had personal knowledge whether any documents referenced derive independent economic value from not being known by others. (§ 3426.1, subd. (d)(1).)

(6) Turner did not state any evidentiary facts establishing she had personal knowledge why Martinez and Barthold accessed any documents or whether they misappropriated any of them, so that her conclusion that they accessed the documents in a manner that was "highly suspect" was an inadmissible as a "speculative and impermissible [opinion] and also lack[s] foundation and personal knowledge." (*Tuchscher, supra,* 106 Cal.App.4th at p. 1238 and fn. 9.)

[12] The Ninth Circuit has a more lenient view. Given the time-sensitive nature of preliminary injunctive relief, the trial court has discretion to consider inadmissible evidence. (E.g., *Johnson v. Couturier* (9th Cir. 2009) 572 F.3d 1067, 1083; *Flynt Distrib. Co., Inc. v. Harvey* (9th Cir. 1984) 734 F.2d 1389, 1394 ["The trial court may give even

21

On appeal, Snelling does not contend that the Turner declaration was admissible. Rather, Snelling maintains that the trial court did not base its preliminary injunction solely on the Turner declaration, and did not consider it "in a vacuum," but rather, "against the backdrop of the overwhelming evidence produced by [defendants] themselves," including, but not limited to the Plan, Santoro's admissions, and the emails containing lists of clients and pricing information.

We agree that even if various challenged portions of the Turner declaration were inadmissible, other evidence before the court and reasonable inferences to be drawn from this evidence provides substantial evidence supporting the preliminary injunction.

First and foremost, Santoro admitted that, after leaving Snelling, he shared Snelling's customer list and confidential customer pricing, markup and annual revenue information with Vaccaro. He claimed to have created the detailed client chart regarding 70 Snelling customers, along with each customer's "estimated annual spend" and "estimated mark-up," from memory and acknowledged he shared this information with Vaccaro to provide the latter with an estimate of how much business Diamond could plan to take from Snelling. The court could well be skeptical of Santoro's testimony that he created this extensive list of detailed information related to 70 Snelling customers from memory. Moreover, even if Santoro did create this list completely from memory, the court properly found he misappropriated it in the circumstances presented. His memory was derived from his direct dealings with Snelling customers by virtue of his employment with Snelling as well as from the confidential information Snelling entrusted to him.

We reject defendants' claim that trade secrets are not misappropriated under CUTSA where they are recreated from one's "memory" of confidential information, as opposed to copied, stored and reproduced by some other means. (*Morlife, supra,* 56 Cal.App.4th at pp. 1522-1523 [" '[T]o afford protection to the employer, the information need not be in writing but may be in the employee's memory. [Citation.]'

inadmissible evidence some weight when to do so serves the purpose of preventing irreparable harm before trial"].)

22

(*Greenly v. Cooper* (1978) 77 Cal.App.3d 382, 392)"].) Defendants assert that "the very fact the individuals worked with the customers while at Snelling is precisely why the names of the customers are not a trade secret," and quote *Moss, Adams & Co. v. Shilling* (1986) 179 Cal.App.3d 124 (*Moss, Adams*) for the proposition that "[e]quity has no power to compel a man who changes employers to wipe clean the slate of his memory. [Citations.]" (*Moss, Adams,* at p. 129.) However, *Moss, Adams* was a pre-CUTSA case that has been rejected or distinguished in subsequent California appellate decisions. In *Moss, Adams,* two accountants used their former employer's customer information to contact the clients they had served. (*Id.* at pp. 126-127.) The court held that the customer information was not a trade secret as a matter of law, "because the clients became known through [the former employees'] personal contact and provision of accounting services." (*Id.* at p. 129.)

Post-CUTSA California appellate decisions have rejected this reasoning. In *American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 635-636, the court held that "the fact that an employee personally renders service to a customer of an employer is not determinative of the trade secret issue. . . . In fact, it is against those very employees who personally service customers that employers are most in need of protection." (*Id.* at p. 636.) Similarly, we rejected the reasoning of *Moss, Adams* in *Morlife, supra,* 56 Cal.App.4th 1514. We explained: "*Moss, Adams* did not appropriately recognize that information developed by an employee concerning the employer's customers represents an investment of time and money *on the part of the employer.*" (*Id.* at p. 1526.) "In the case of a former employee who attempts to use personal customer contacts for personal benefit upon going into competition with the former employer, '[i]t is this personal acquaintance and additional influence of the friendship developed during [this] employment . . . which makes solicitation of former customers by appellant *so unfair to his former employer.* [Citations.]' [Citation.]" (*Ibid.*)

Further evidence supporting the court's finding it likely that defendants have used trade secrets or confidential information both is found in the testimony of Martinez and

23

Barthold (albeit in response to the Turner declaration), in which they acknowledge accessing various Snelling files and reports immediately before their resignations, and in Martinez's case, on the evening before her resignation. Barthold, former general manager of Snelling's Milpitas office, testified the information he accessed shortly before resigning included, but was not limited to, reports of temp hours, weekly and monthly production and budgeting reports, hourly reports of the Hayward and Tracy offices, an electronic document containing the many passwords needed to perform his job, and Excel spreadsheets containing some of his prospects. Martinez, former general manager of the Hayward office, admitted she accessed the business plan she had been developing for the office, as well as Hayward customer lists. She did not recall whether she accessed the profit and loss statement for the Hayward office, but did recall accessing a document she called the "P&L" in January or February 2012, as part of her efforts to develop the Hayward budget for 2013-2014.

Although each provided justifications for these actions and asserted his or her access was part of conducting normal job responsibilities on behalf of Snelling, the trial court could have found their proffered reasons not credible in light of the other evidence regarding the Plan, the sequence of events involving the migration of employees to Diamond, and the like. After being hired by Diamond, the former Snelling employees immediately initiated contact with their previous customer contacts on behalf of Diamond and attempted to capitalize on their previous relationships with these customers, just as anticipated in the Plan.

Defendants rely upon *American Paper, supra,* 183 Cal.App.3d 1318, to bolster their claim that the uncontradicted evidence showed it was simple to determine the names of staffing companies and which customers used which staffing companies through the internet. We disagree.

In *American Paper,* the Court of Appeal affirmed a judgment for the defendants following a jury trial, holding that the evidence supported a conclusion there was no protectable trade secret because, although the information in question might not be generally known to the public, it was "known or readily ascertainable to other persons in

24

the shipping business.  The compilation process in this case is neither sophisticated nor difficult nor particularly time consuming." (*American Paper, supra,* 183 Cal.App.3d at pp. 1326-1327.)  It is noteworthy that in affirming the trial court's denial of a preliminary injunction, the appellate court "view[ed] the evidence presented in the light most favorable to the prevailing party . . . ." (*Id.* at p. 1326.)

*ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 21 (*ABBA*), disagreed with *American Paper, supra,* 183 Cal.App.3d 1318, to the extent the latter suggested that information was not protectable if it was readily ascertainable.  *ABBA* concluded that readily ascertainable information *can* be a trade secret so long as it has not yet been ascertained by others in the industry.  The question in *ABBA* was whether a former employee and his new employer were properly enjoined from soliciting the customers of the former employer, a manufacturer of rubber rollers.  (*Id*. at p. 7.)  The Court of Appeal stated the defendants could establish a defense to the misappropriation claim by convincing the factfinder it was a " 'virtual certainty' " that anyone who manufactured certain types of products used rubber rollers; that the manufacturers of those products were easily identifiable; and that the defendants' knowledge of the plaintiff's customers resulted from that identification process, rather than from the plaintiff's records.  Such defense would be based on an absence of misappropriation rather than the absence of a trade secret.  (*Id*. at pp. 21-22, fn. 9.)

As summarized by the court in *Morlife, supra*, 56 Cal.App.4th at pages 1521-1522:  "With respect to the general availability of customer information, courts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories.  (*American Paper*[*, supra,*] 183 Cal.App.3d [at p.] 1326.)  On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market.  Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers.  [Citations.]  As a general principle, the more difficult information is to obtain, and the

25

more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret. [Citation.]

"The requirement that a customer list must have economic value to qualify as a trade secret has been interpreted to mean that the secrecy of this information provides a business with a 'substantial business advantage.' [Citation.] In this respect, a customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested. (*Courtesy*[*, supra,*] 222 Cal.App.3d [at pp.] 1287-1288.) Its use enables the former employee 'to solicit both more selectively and more effectively.' [Citation.]" (*Morlife, supra,* 56 Cal.App.4th 1514, 1521-1522.)

Here, the allegedly misappropriated trade secrets, including the customer compilation went far beyond the simple, readily known or ascertainable customer list considered in *American Paper*, *supra,* 183 Cal.App.3d 1318. Rather, it included confidential financial information, expected pricing, and markups for individual customers. In addition, the defendants in *American Paper* were not singling out specific customers of the former employer, but were cold calling manufacturers, "calling on every manufacturer they can . . . ." (*Id.* at p. 1325.) In contrast, the Plan developed by Santoro for Diamond was expressly designed to target and acquire Snelling's key employees and the customers they serviced. Although Santoro described various roundabout methods by which he believed potential client's could be identified on the internet through accessing information about persons seeking temporary staffing positions using internet job boards and similar tools, he also testified that he did not know whether the former Snelling employees hired by Diamond did anything to "independently source" a major Snelling client solicited by Diamond. There was no evidence that former Snelling employees were cold-calling potential customers or that they used the type of process Santoro suggested could be used to identify possible customers, rather than the ready-made list of confidential information he had provided Vaccaro or confidential information employees

26

obtained through their previous relationships with the listed companies' representatives, acquired through their employment at Snelling.

## V. CUTSA Preemption of Unfair Competition Claim

Defendants argue that the trial court abused its discretion in issuing the preliminary injunction on the ground Snelling was likely to prevail on its unfair competition claim. They contend that CUTSA (§ 3426 et seq.) preempts the unfair competition claim because that claim is based on the same nucleus of facts as Snelling's trade secret claim.

In *K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939 (*K.C. Multimedia*), the Sixth Appellate District held that CUTSA "preempts common law claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.' [Citation.]" (*Id.* at p. 958.) As explained by the court: "[a]t least as to common law trade secret misappropriation claims, 'UTSA occupies the field in California.' [Citation.]" (*Id.* at p. 958.)[13] In holding that CUTSA preempted a claim for unfair competition, the court explained: " 'California recognizes claims for both common law unfair competition and statutory unfair competition.' [Citations.] 'A claim for common law or even statutory unfair competition may be preempted under [Civil Code section] 3426.7 if it relies on the same facts as the misappropriation claim.' [Citations.] 'Courts and commentators frequently analyze separately unfair competition and trade secrets protection.' [Citation.] 'Nevertheless, at

---

[13] CUTSA's preemption provision states that the act does not supersede "(1) contractual remedies, whether or not based upon misappropriation of a trade secret, [and] (2) other civil remedies that are not based upon misappropriation of a trade secret. . . ." (§ 3426.7, subd. (b).) " 'At the same time, [section] 3426.7 implicitly preempts alternative civil remedies based on trade secret misappropriation.' [(Trade Secrets Practice in Cal. (Cont.Ed.Bar 2d ed. 2008) Litigation Issues, § 11:35, p. 430.) ]" (*K.C. Multimedia, supra,* 171 Cal.App.4th at p. 954; accord, *Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 236 (*Silvaco*), disapproved on other grounds in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337 ["We thus reaffirm that CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies 'based upon misappropriation of a trade secret' [Citation ]"].)

bottom, trade secret protection is itself but a branch of unfair competition law.' [Citation.]

"California's statutory unfair competition law permits claims for 'unlawful, unfair or fraudulent' business practices. (Bus. & Prof. Code, § 17200; *Feitelberg v. Credit Suisse First Boston, LLC* [(2005)] 134 Cal.App.4th [997], 1009.) 'A business practice is unlawful "if it is forbidden by any law . . . ." ' [Citation.] 'A business practice, however, may be unfair or fraudulent in violation of the UCL even if the practice does not violate any law.' [Citation.]" (*K.C. Multimedia, supra,* 171 Cal.App.4th at pp. 961-962.)

Nor can a claim simply depend on a "different theory of liability" to survive CUTSA's preemptive effect. (*K.C. Multimedia, supra*, 171 Cal.App.4th at pp. 957-959.) "*Depending on the particular facts pleaded,* the statute can operate to preempt [claims of] breach of confidence, interference with contract, and unfair competition" and was held to have done so in *K.C. Multimedia.* (*Id.* at pp. 958-959, italics added.)

Preemption generally applies where there is no material distinction between the wrongdoing underlying the CUTSA claim and the non-CUTSA claim. (See *Mattel, Inc. v. MGA Entertainment, Inc., supra*, 782 F.Supp.2d at p. 986; see *K.C. Multimedia, supra,* 171 Cal.App.4th at p. 960.) CUTSA does not preempt "other civil remedies that are not based upon misappropriation of a trade secret" or contractual or criminal remedies. (§ 3426.7, subd. (b).)

Snelling contends that *K.C. Multimedia, supra,* 171 Cal.App.4th 939, is distinguishable, pointing out the court's recognition in that case that the "appellant's statutory unfair competition claim rests squarely on its factual allegations of trade secret misappropriation. As a legal basis for its unfair competition claim, appellant asserts a violation of CUTSA. As a factual basis for its claim, appellant alleges the same conduct that gives rise to trade secrets claim. [Citation.]" (*Id.* at p. 962.) Snelling argues that here, in contrast, the allegations supporting Snelling's unfair competition and trade secret claims were "factually distinct" and did not rest "entirely" on allegations of trade secret misappropriation. Although the causes of action for statutory unfair competition and misappropriation of trade secrets incorporated by reference all previous allegations, it is

28

true that Snelling's trade secret claim focused on the use by former employees of "highly sensitive and confidential information, including customer lists, profit and loss statements, weekly revenue reports, and business plans." Its unfair competition cause of action focused on defendants' inducing former full time managers to break their employment agreements and their interfering with those agreements, "based in part on [d]efendants' unlawful use of Snelling's confidential information and its customer list . . . ." Snelling states it "does not necessarily disagree" with defendants' argument that the employee salary information is not a trade secret. However, it maintains that such information is "confidential information" that a competitor could use to unlawfully solicit a competitor's employees for unlawful purposes, such as raiding a competitor's staff of its employees.

The trial court's findings did not distinguish between information that constituted "trade secrets" for purposes of the CUTSA cause of action and that "confidential information" underlying the unfair competition claim. It used the terms interchangeably, finding "there is a likelihood that Defendants have improperly accessed, used and/or disclosed the 'trade secrets' and/or confidential information of Snelling to unfairly compete with Snelling," and that "there is a likelihood that Defendants have used 'trade secrets' and/or confidential information to improperly and unfairly solicit and/or hire former Snelling employees for an unlawful purpose because the departure of many key managers is contemporaneous with them accessing and/or downloading 'trade secrets' and/or 'confidential' information." However, as we observed at the outset, we review the court's action and not its reasons in determining whether the court abused its discretion in issuing the preliminary injunction. We will affirm so long as the grant of the preliminary injunction was correct on any theory. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra,* ¶¶ 8:214-8:217.)

As we have already stated, our decision regarding trade secret is not a final adjudication on the merits of that claim. " 'The ultimate determination of trade secret status is subject to proof presented at trial.' (*Whyte v. Schlage Lock Co., supra,* 101 Cal.App.4th at p. 1453.)" (*ReadyLink, supra,* 126 Cal.App.4th at p. 1017.)

Consequently, it is possible that the trier of fact will ultimately determine that some or all of the information alleged to have been misappropriated did not constitute trade secrets, but that the solicitation of Snelling employees using confidential salary information for the purpose of luring away Snelling's customers constituted unfair competition nevertheless. We believe it would be premature for us to determine here that CUTSA necessarily preempts the unfair competition cause of action. In the circumstances, we conclude the determination whether the same nucleus of facts underlies both the unfair competition and the trade secrets claims should await trial.

## VI. Challenges to the Scope of the Preliminary Injunction

Defendants challenge certain provisions of the preliminary injunction as "procedurally defective, overbroad, vague and ambiguous."

### A. *Paragraph 1*

1. Defendants challenge the provision of paragraph 1 incorporating a definition of trade secrets or confidential information "as that term is defined in Santoro's Employment Agreement with Snelling and otherwise." Although not attached to the injunction, the employment agreement was attached as an exhibit to the complaint. We believe this is sufficient in the circumstances. To the extent the phrase "and otherwise" might be considered unduly vague, it is adequately clarified by the specific items listed immediately thereafter.

2. Defendants contend the restraint on use of Snelling's "marketing techniques" is unclear. Paragraph 1 of the injunction also lists among the trade secrets or confidential information defendants are prohibited from using, disclosing or acquiring: "confidential information relating to Snelling's sales pipeline and sales and *marketing strategies*, pricing and cost codes, mark-up information, *marketing techniques*, strategic business plans and market research studies . . . ." (Italics added.) Use of the term . . . "marketing strategies" before the challenged term "marketing techniques," indicates the latter term is either surplusage or likely refers to something more general than confidential marketing strategies developed by Snelling.

"A former agent may use, after the termination of his employment, 'methods of doing business and processes which are but skillful variation of general processes known to the particular trade.' (Restatement of Agency, sec. 396, comment, cl. (b).)" (*Fortna v. Martin* (1958) 158 Cal.App.2d 634, 640, declined to follow by *Lifetouch Nat. School Studios, Inc. v. Moss-Williams* (N.D. Cal., Aug. 25, 2011, No. 5:10-CV-05297 JF HRL) 2011 WL 3759940, *2.)

We agree with defendants that the meaning of the term "marketing techniques" is unclear in this context. The court should modify the injunction to clarify the term or delete it from the injunction.

3. Defendants challenge the injunction's restraint of their use of Snelling's "confidential pricing strategies" as unclear. Relying on *Fortna v. Martin, supra,* 158 Cal.App.2d 634, they contend that a method of pricing is not generally a trade secret. We have already rejected this claim, as did the federal district court in *Lifetouch Nat. School Studios, Inc. v. Moss-Williams*, *supra,* 2011 WL 3759940, *5 [customer lists and pricing methods may qualify as trade secrets under California law]; see, e.g., *Morlife, supra,* 56 Cal.App.4th at pages 1521-1522; *Whyte v. Schlage Lock Co., supra,* 101 Cal.App.4th at pages 1454-1456.

4. Defendants contend the language of paragraph 1, restraining them from "directly or indirectly" using, disclosing, or acquiring Snelling's trade secrets or confidential information is unclear in context. They acknowledge CUTSA prohibits use of trade secrets. (§ 3426.1, subd. (b)(2).) At the hearing on the preliminary injunction, the court expressed its concern that the defendants were ignoring the court's prior TRO and were continuing to solicit Snelling customers in violation of that order. Use of the phrase "directly or indirectly" appears to have been reasonably targeted to deal with defendants' apparent attempt to skirt the TRO. To the extent the language adds nothing, defendants are not prejudiced. In any event, defendants have not attempted to explain how this language prevents them from doing something they would not otherwise be prohibited from doing under the injunction.

**B.** *Paragraph 2*

The TRO issued on March 5, commanded defendants to "refrain from allowing any former Snelling employee who Defendant Diamond now employs from selling to or soliciting any Snelling customer with whom they worked while employed by Snelling, *insofar as any such selling to or soliciting of Snelling's customers is based in any way on use or disclosure of Snelling's trade secrets.*" (Italics added.)

Paragraph 2 of the preliminary injunction orders defendants to "refrain from allowing any former Snelling employee who Defendant Diamond now employs from soliciting any Snelling customer with whom they worked for or provided any services of any kind while employed by Snelling." [*Sic.*] The court eliminated the TRO's restriction on former Snelling employees "selling" to former Snelling clients, but also broadened the preliminary injunction by eliminating the tie to trade secret use or disclosure.

Defendants maintain the preliminary injunction violates California Rules of Court, rule 3.1150(c)[14] and is void because it contains significantly harsher restrictions than Snelling sought in its order to show cause, which requested the trial court issue an injunction "consistent with the TRO." At the hearing on the preliminary injunction, defendants' counsel made that argument. Snelling's counsel responded, "we're fine with the adoption of the preliminary injunction that tracks the TRO. We do submit . . . that we should revisit some of the language there, because what we have also found is that these defendants have blatantly ignored your TRO and continued to service Snelling clients using our confidential information, including the markup information, to try and continue to transition their plan. And given that there is a Phase II and Phase III, we need to send a message to these defendants that you're serious, that your TRO was meant to be

---

[14] "The [Order to Show Cause (OSC)] and TRO must be stated separately, with the OSC stated first. The restraining language sought in an OSC and a TRO must be separately stated in the OSC and the TRO and may not be incorporated by reference. *The OSC must describe the injunction to be sought at the hearing.* The TRO must describe the activities to be enjoined pending the hearing. A proposed OSC must contain blank spaces for the time and manner of service on responding parties, the date on which the proof of service must be delivered to the court hearing the OSC, a briefing schedule, and, if applicable, the expiration date of the TRO." (Cal. Rules of Court, rule 3.1150 (c).)

followed. Because they weren't following it when you issued it on March 5th."
Defendants' counsel responded that allegations that Diamond employees had been
visiting Snelling customers "does not establish a violation of the TRO. The TRO was
very clear that defendants were restricted from soliciting . . . Snelling's customers by
misappropriating trade secrets. Visiting a customer is not misappropriating a trade secret.
We've been very, very careful not to misappropriate any trade secret when we're
speaking with customers, whether Snelling's customers or anybody else's." The court
agreed with Snelling's counsel that defendants had "played a game" with the language
relating to use of trade secrets in that defendants had maintained that they were not
violating the TRO so long as the information came from Santoro's memory. The court
concluded that the new evidence of defendants' "virtually ignoring the Court's prior
orders" by misconstruing the reach of the TRO and continuing to solicit customers
warranted its changing the language of the preliminary injunction from that of the TRO.
In these limited circumstances, we do not find the court abused its discretion or that
defendants were not provided notice of the actions that which the preliminary injunction
restrained.

**C.** *Paragraph 4*

Paragraph 4 prohibits Santoro from providing "any services, directly or indirectly,
to any customer or account to which he was assigned" or for which he was responsible
for approving pricing "while employed by Snelling, insofar as any such services are
based in any way on his use or disclosure of Snelling's Trade Secrets." Defendants again
challenge use of the phrase "directly or indirectly, contending it renders the provision
vague, ambiguous and overbroad. As we have discussed with respect to the use of that
phrase in paragraph 1 of the injunction, the phrase "directly or indirectly" appears to have
been reasonably targeted to deal with defendants' apparent attempt to skirt the TRO. To
the extent the language adds nothing, defendants are not prejudiced. Nor have defendants
explained how this language prevents them from doing something they would not
otherwise be prohibited from doing under the injunction.

33

## VII.  Denial of Defendants' Motion to Compel Arbitration

Defendants contend the trial court erred in denying their motion to compel arbitration.  We disagree.

### A.  *The Arbitration Agreement*

The employment agreement executed by Santoro and Snelling provided in relevant part:  "12)  You [employee] agree that all disputes regarding termination of Your employment will be resolved exclusively in accordance with the SNELLING Dispute Resolution Policy.  You agree that arbitration may be compelled and enforced under the Federal Arbitration Act or other applicable law. [¶] . . . [¶]   14) Nothing herein shall prohibit SNELLING from exercising its right to obtain injunctive relief for conduct that will cause it loss or damage."

The "Dispute Resolution Policy" referred to in the employment agreement was part of Snelling's "Personnel Policy."  That section provided in relevant part:

"**Introduction** [¶] "The SNELLING Dispute Resolution Policy provides an impartial, cost-effective and quick procedure to resolve termination disputes between the Company and its employees.  In recognition that some disagreements may not be resolved internally, mediation and final and binding arbitration are available to employees under this Policy."

"**Procedure**  *Covered Employees and Disputes.*  [¶] The Dispute Resolution Policy applies to all employees of SNELLING.  Covered disputes include all claims that an employee was discharged because of his or her race, color, religion, sex (including sexual harassment), national origin, age, disability, mental or physical handicap, workers' compensation claim or other protected basis and all other claims that the discharge was prohibited or unlawful under any local, state or federal law (including common or statutory law) or in violation of an employment agreement.  The Dispute Resolution Policy does not cover claims for unemployment or workers' compensation benefits, personal injury claims or claims arising under a collective bargaining agreement or the National Labor Relations Act.  *The Policy also does not apply to claims by SNELLING for injunctive or other relief for unfair competition or the use or disclosure of*

34

*confidential information. All covered disputes will be resolved exclusively under this Policy.*" (Italics added.)" The "Dispute Resolution Policy" also provided: "If any part of this Policy is in conflict with any mandatory requirement of applicable law, the statute shall govern, and that part shall be reformed and construed to the maximum extent possible in conformance with the applicable law. The Dispute Resolution Policy shall remain otherwise unaffected and enforceable."

At page 2-23 of the Personnel Policy, a single page acknowledgement captioned "Snelling Dispute Resolution Policy" apparently was to be signed by the employee. That acknowledgement stated in relevant part: "I agree that all disputes regarding termination of employment shall be resolved exclusively in accordance with the Snelling Dispute Resolution Policy. . . . [¶] I understand that any claim for wrongful discharge must be asserted under the Policy within 180 days after I first receive notice of the termination decision. . . . [¶] . . . [¶] I also understand that this Policy shall survive the employee-employer relationship and that it does not cover claims for unemployment or workers' compensation benefits, personal injury claims, claims under a collective bargaining agreement or the National Labor Relations Act *or claims by the Company for injunctive or equitable relief for unfair competition or the use or disclosure of confidential information.* The Policy applies only to claims of wrongful termination arising under local, state or federal law or an agreement between the parties. . . ." (Italics added.) The record before us does not indicate that Santoro ever signed this acknowledgement of the Policy.

**B.** *Trial Court Denies Motion to Compel Arbitration*

In its March 28, 2012 order denying defendants' motion to compel arbitration and to dismiss the action, the trial court found the language of the arbitration provision "specifically excludes the claims brought by [Snelling] in its Second Amended Complaint (as well as the claims brought by Defendants in their cross-complaint)." The court found the arbitration provision enforceable, despite the apparent "carve out" from arbitration of claims that Snelling could bring as an employer. Further, the court stated, "the parties agreed to arbitrate certain disputes and anticipated resolution of potential

35

conflicts with the following language, '[i]f any part of this Policy is in conflict with any mandatory requirements of applicable law, the statute shall govern, and that part shall be reformed and construed to the maximum extent possible in conformance with the applicable law. The Dispute Resolution Policy shall remain otherwise unaffected and enforceable.' [Citation.] Thus, if there is any legal or statutory conflict with the provision excluding Plaintiff's claims from arbitration, the Court 'reforms' the provision to exclude all such claims, whether brought by Plaintiff (as employer) or Defendant (as employee). The Court also notes that the Policy does not appear to exclude the entire 'universe' of conceivable claims that may be brought by an employer or an employee. Thus, at least in this respect, the arbitration agreement appears substantively conscionable."

## C. *Standard of Review*

" 'The scope of arbitration is a matter of agreement between the parties.' [Citation.] 'A party can be compelled to arbitrate only those issues it has agreed to arbitrate.' [Citation.] Thus, 'the terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested.' [Citation.] For that reason, 'the contractual terms themselves must be carefully examined before the parties to the contract can be ordered to arbitration' by the court. [Citation.]" (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 705 (*Molecular Analytical Systems*); see *California Correctional Peace Officers Assn. v. State of California* (2006) 142 Cal.App.4th 198, 204-205 ["Accordingly, in ruling on a petition to compel, the court must determine whether the parties entered into an enforceable agreement to arbitrate that reaches the dispute in question, construing the agreement to the limited extent necessary to make this determination. [Citation.]"].)

" ' " 'Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear that the arbitration clause cannot be interpreted to cover the dispute.' " [Citation.]' [Citation.]" (*California Correctional Peace Officers Assn. v.*

*State of California, supra,* 142 Cal.App.4th 198, 204-205; accord, *Molecular Analytical Systems, supra,* 186 Cal.App.4th at pp. 707-708.)

"As a corollary, 'an exclusionary clause in an arbitration provision should be narrowly construed.' [Citation.] [¶] The party opposing arbitration has the burden of showing that the agreement, as properly interpreted, does not apply to the dispute. [Citations.]" (*Molecular Analytical Systems, supra,* 186 Cal.App.4th at p. 705.)

"In general, '[t]here is no uniform standard of review for evaluating an order denying a motion to compel arbitration. [Citation.] If the court's order is based on a decision of fact, then we adopt a substantial evidence standard. [Citations.] Alternatively, if the court's denial rests solely on a decision of law, then a de novo standard of review is employed. [Citations.]' [Citation.]" (*Laswell v. AG Seal Beach, LLC* (2010) 189 Cal.App.4th 1399, 1406.)

Snelling contends application of the abuse of discretion standard of review is appropriate here because the trial court severed and modified the language of the policy (citing *Armendariz v Foundation Health Psychcare Service, Inc.* (2000) 24 Cal.4th 83, 122 (*Armendariz*), in turn citing § 1670.5) and because the court based its order on factual decisions, including that defendants have claims against Snelling based on unfair competition and are seeking compensatory and punitive damages. We disagree.

Whether the court abused its discretion in severing or modifying language in the arbitration provision does not bear upon our initial determination whether the parties entered into an enforceable agreement to arbitrate that reaches the dispute or disputes in question. (See *California Correctional Peace Officers Assn. v. State of California, supra,* 142 Cal.App.4th at pp. 204-205.) *Armendariz* does not suggest otherwise. There, the court observed that Civil Code section 1670.5 "appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is 'permeated' by unconscionability." (*Armendariz,* at pp. 121-122.)

"When, as here, no conflicting extrinsic evidence is introduced to aid the interpretation of an agreement to arbitrate, the Court of Appeal reviews de novo a trial court's ruling on a petition to compel arbitration.  [Citation.]"  (*California Correctional Peace Officers Assn. v. State of California, supra,* 142 Cal.App.4th at pp. 204-205.)

**D.  *Language of the Dispute Resolution Policy Clearly and Unambiguously Covers Only Disputes Regarding Termination and Excludes Claims for Injunctive or Other Relief for Unfair Competition or Use or Disclosure of Confidential Information***

Defendants expend considerable effort arguing that the arbitration agreement *may* be read as applying to the parties' causes of action because the Dispute Resolution Policy referenced in the employment agreement contains the phrase "Covered disputes include," followed by a list of various types of claims arising from discharge from employment, that defendants maintain is *not exhaustive* and does not purport to list all covered claims.[15]  Defendants argue this assertion is buttressed by the next two sentences in the policy that exclude from coverage  "claims for unemployment or workers' compensation benefits, personal injury claims or claims arising under a collective bargaining agreement or the National Labor Relations Act" as well as claims by Snelling for "injunctive or other relief for unfair competition or the use or disclosure of confidential information." Whether or not additional claims may be covered by the policy, the policy clearly and unambiguously excludes the relief sought here for trade secret and unfair competition.

Furthermore, the employment agreement, the policy, and the employee signature form portion of the policy *each* state that the parties agree to arbitrate *termination* disputes:

---

[15] We note that in the context of collective bargaining agreements containing arbitration provisions, the courts have required that any waiver of the employee's right to a judicial forum for statutory claims must be "clear and unmistakable." (See *14 Penn Plaza LLC v. Pyett* (2009) 556 U.S. 247, 251; *Wright v. Universal Maritime Service Corp.* (1998) 525 U.S. 70, 82.)  Such caution may explain why these particularly sensitive claims relating to employee discharge were specifically listed as covered by the arbitration provision of the policy.

The employment agreement provides that the employee agrees that "all disputes *regarding termination* . . . will be resolved exclusively in accordance with the . . . 'Dispute Resolution Policy' "; but that "[n]othing herein shall prohibit SNELLING from exercising its right to obtain injunctive relief for conduct that will cause it loss or damage."  (Italics added.)

The policy itself provides in its introduction that the "Dispute Resolution Policy provides an impartial, cost-effective and quick *procedure to resolve termination disputes* between the Company and its employees."  (Italics added.)  The coverage provisions that follow reference "all claims that an employee was *discharged*" because of various discriminatory factors or other protected basis and "all other claims that *the discharge* was prohibited or unlawful under any local, state or federal law (including common or statutory law) or in violation of an employment agreement.'  (Italics added.)  That the agreement specifically references particular types of unlawful discharge does not preclude other claims *regarding the employee's discharge or termination* from being subject to arbitration—save for those specifically excluded claims for unemployment or workers' compensation benefits, or personal injury that might be related to the employee's discharge.

The employee acknowledgement page of the policy further supports limiting the arbitration agreement to termination disputes.  The employee specifically acknowledges "that *all disputes regarding termination* of employment shall be resolved exclusively in accordance with the Snelling Dispute Resolution Policy," and that the policy "does not cover claims for unemployment or workers' compensation benefits, personal injury claims, claims under a collective bargaining agreement or the National Labor Relations Act or claims by the Company for injunctive or equitable relief for unfair competition or the use or disclosure of confidential information."  (Italics added.)  Finally, the employee acknowledgement states:  "*The Policy applies only to claims of wrongful termination* arising under local, state or federal law or an agreement between the parties. . . ."  (Italics added.)

39

Defendants mistakenly assert, without citation to the record, that the trial court did not agree that the scope of the arbitration language contained in the policy applies only to termination disputes. To the contrary, the court "sever[ed] any aspect of this case relating to wrongful termination." It further stayed, under Code of Civil Procedure section 1281.4, "all proceedings in this action relating to any claim by Santoro that he was wrongfully terminated," until further order of the court, except for proceedings necessary to determine the pending petition to compel arbitration.[16] In so doing, the court implicitly agreed that the wrongful termination claims were the only possible claims that could be arbitrated under the employment agreement. (See Code Civ. Proc., § 1281.4 ["If the issue which is the controversy subject to arbitration is severable, the stay may be with respect to that issue only"].)

In any event, our independent review of the provisions of these documents convinces us the arbitration provision covers only disputes regarding or arising from the employee's termination.

**2.** Defendants next contend that the exclusion may (and therefore should) be read as inapplicable because the exclusionary sentence in one part of the Dispute Resolution Policy excludes claims by Snelling for "injunctive *or other relief* for unfair competition or the use or disclosure of confidential information;" whereas the acknowledgement page provides more narrowly that the policy does not cover claims by Snelling for "injunctive or *equitable* relief for unfair competition or the use or disclosure of confidential information." (Italics added.) Defendants contend the exclusion should therefore be read

---

[16] Code of Civil Procedure, section 1281.4, provides in relevant part: "If an application has been made to a court of competent jurisdiction . . . for an order to arbitrate a controversy which is an issue involved in an action or proceeding pending before a court of this State and such application is undetermined, the court in which such action or proceeding is pending shall, upon motion of a party to such action or proceeding, stay the action or proceeding until the application for an order to arbitrate is determined and, if arbitration of such controversy is ordered, until an arbitration is had in accordance with the order to arbitrate or until such earlier time as the court specifies.

"If the issue which is the controversy subject to arbitration is severable, the stay may be with respect to that issue only."

as limited to claims by Snelling for injunctive or *equitable* relief for unfair competition or the use or disclosure of confidential information and that, so read, such exclusion does not apply to Snelling's causes of action seeking damages in addition to equitable relief or to the causes of action raised in defendants' cross-complaint.

As we have determined the agreement to arbitrate contained in the employment agreement, which incorporates the Dispute Resolution Policy by reference, covers *only termination* disputes, rather than *all* disputes between the parties other than those specifically excepted, the proffered inconsistency in the language in the exclusion whether extending to injunctive relief and either "other relief" or "equitable relief" for unfair competition or disclosure of confidential information is irrelevant. Snelling's causes of action are all based on defendants' actions *after* Santoro's termination.

Nor are we persuaded by defendants' argument that the causes of action contained in their cross-complaint against Snelling for declaratory relief, injunctive relief, unfair competition, and intentional interference with prospective economic are related to Santoro's termination or that they seek relief that is not primarily equitable. Defendants' cross-complaint contains a statement consistent with Code of Civil Procedure section 1281.8, subdivision (b), that "Cross-Complainants file this Cross-Complaint *solely for the purpose of obtaining preliminary relief under Code of Civil Procedure section 1281.8 . . .*" Such "preliminary relief" equates to the "provisional" remedies described in that statute, which are undisputedly equitable remedies. (See *Woolley v. Embassy Suites, Inc.* (1991) 227 Cal.App.3d 1520, 1528 [equitable rules preserved in Code Civ. Proc. § 1281.8 provisional remedies] ; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, Suits in Equity, §§ 784-882, pp. 203-300.) Furthermore, each of the causes of action incorporates the allegation that if the restrictive covenant of the employment agreement is enforced, defendants will "incur damages and loss for which no adequate remedy at law exists."

Although the parties concede the employment agreement governed Santoro's employment with Snelling, the parties have pointed to no evidence in the record before us that Santoro *signed* the one-page acknowledgement using the narrower term "equitable

41

relief." (Nor do the parties point to any evidence regarding the circumstances of Santoro's accepting or executing the employment agreement or whether any negotiation occurred or was possible in the circumstances.)

In any event, as we have stated, differences in the terms "other relief" in the policy and "equitable relief" in the acknowledgement are irrelevant here.

### E. *Claim That the Arbitration Agreement is Unconscionable*

Defendants contend the arbitration agreement is unconscionable and therefore should be *enforced* as to all claims between the parties. Specifically, they argue the provision of the Dispute Resolution Policy stating the "Policy also does not apply to claims by Snelling for injunctive or other relief for unfair competition or the use or disclosure of confidential information" is unconscionable. Therefore, they argue, the *exclusion* clause should be severed from the arbitration agreement and the remainder of the arbitration agreement (which they interpret to encompass all of Snelling's claims against them) should be enforced, so that Snelling's claims must be arbitrated. Defendants further argue that the trial court erred in "reforming" the exclusion to Snelling's benefit, rather than severing it and enforcing the remainder of the arbitration agreement. We disagree.[17]

**1.** "Agreements to arbitrate may be invalidated if they are found to be unconscionable. (Civ. Code, § 1670.5, subd. (a); see *Armendariz, supra,* 24 Cal.4th at pp. 113-114.) Often, the first step in the unconscionability analysis is to determine whether the contract is one of adhesion. (*Armendariz, supra,* 24 Cal.4th at p. 113.)

_____

[17] It is unclear whether defendants also maintain the clause in the employment agreement providing that, "Nothing herein shall prohibit SNELLING from exercising its right to obtain injunctive relief for conduct that will cause it loss or damage" is also unconscionable.

In any event, severing that clause from the employment contract does not prevent arbitration of a claim *otherwise covered* by the arbitration agreement, because Code of Civil Procedure section 1281.8 provides for provisional remedies, specifically including preliminary injunctions and temporary restraining orders, in connection with a pending arbitration, where a party to the arbitration shows the award to which the party may be entitled may be rendered ineffectual without provisional relief. Consequently, there would be no need to sever this provision.

Adhesive contracts are those where a party of superior bargaining strength drafts the contract and imposes its terms in a take-it or leave-it manner.  If the contract is found to be adhesive, the court then determines whether other factors limit its enforceability under established legal principles.  (*Ibid*.)

"The doctrine of unconscionability contains two components:  procedural unconscionability and substantive unconscionability.  Procedural unconscionability focuses on 'oppression' or 'surprise' due to unequal bargaining power.  (*Armendariz, supra,* 24 Cal.4th at p. 114.)  The procedural element generally takes the form of an adhesion contract, which ' "imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." ' (*Id*. at p. 113, quoting *Neal v. State Farm Ins. Cos.* (1961) 188 Cal.App.2d 690, 694.)  Substantive unconscionability, on the other hand, focuses on overly harsh or one-sided results.  (*Armendariz, supra,* 24 Cal.4th at p. 114.)  Substantively unconscionable terms may 'generally be described as unfairly one-sided.' (*Little v. Auto Steigler, Inc.* (2003) 29 Cal.4th 1064, 1071.)  For example, an agreement may lack 'a modicum of bilaterality' and therefore be unconscionable if the agreement requires 'arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party.' (*Armendariz, supra,* 24 Cal.4th at p. 119.)

"*Both procedural and substantive elements of unconscionability must be present for a court to refuse to enforce an arbitration agreement.* (*Armendariz, supra,* 24 Cal.4th at p. 114[, italics added by this court].)  However, both elements need not be present in the same degree.  Generally a sliding scale approach is taken; that is, 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' (*Ibid*.)" (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 713-714; see *Serpa v. California Surety Investigations* (2013) 215 Cal.App.4th 695,703.).)

Section 1670.5[18] appears to give a trial court some discretion as to whether to sever or restrict an unconscionable provision or whether to refuse to enforce the entire agreement, where the agreement is "permeated" by unconscionability. (*Armendariz, supra,* 24 Cal.4th at p. 122.) According to the Supreme Court in *Armendariz*, there are two reasons for severing or restricting illegal terms rather than voiding the entire contract. "The first is to prevent parties from gaining undeserved benefit or suffering undeserved detriment as a result of voiding the entire agreement—particularly when there has been full or partial performance of the contract. [Citations.] Second, more generally, the doctrine of severance attempts to conserve a contractual relationship if to do so would not be condoning an illegal scheme. [Citations.] The overarching inquiry is whether 'the interests of justice . . . would be furthered' by severance. [Citation.]" (*Id.* at pp. 123-124.)

**2.** Although it is undisputed that Santoro and Snelling executed Santoro's employment agreement, which incorporated the Dispute Resolution Policy, the record before us contains no evidence whatsoever on the circumstances of Santoro's execution of the agreement—that is, whether the arbitration provision was presented to Santoro on a "take-it-or-leave it" basis. "As a general rule, the burden of proof as to unconscionability rests with the person asserting it." (Schwing, 3 Cal. Affirmative Def. (2013 ed.) § 55:6, fn. omitted; see Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2012) ¶¶ 5:155.30, 5-120 to 5-121; *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.* (2010) 187 Cal.App.4th 1405, 1416.) Although by its terms, the employment agreement here appears to be a contract of adhesion, the lack of any evidence other than the terms of the agreement itself make it impossible for us to determine that it was adhesive and so procedurally unconscionable. Because both procedural and substantive elements of unconscionability must be present to declare an

---

[18] "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (§ 1670.5, subd. (a).)

44

arbitration agreement unconscionable, this failure of proof that the agreement was adhesive precludes a finding that it was unconscionable.

Absent evidence regarding the circumstances of Santoro's execution of the employment agreement and the opportunity or lack thereof to bargain about the arbitration clause, we cannot conclude the court erred in denying defendants' motion to compel arbitration.

**3.** Furthermore, were we to agree that the arbitration agreement was adhesive and therefore procedurally unconscionable, we would still be unpersuaded that the remedy sought by defendants—forcing all disputes between the parties to arbitration—was warranted.

Defendants argue that the trial court erred in refusing to sever the provision excluding claims by Snelling "for injunctive or other relief for unfair competition or the use or disclosure of confidential information." As we have stated repeatedly, the arbitration provision covers only termination-related disputes and no claims related to Santoro's termination are at issue on this appeal. Both Snelling's claims against defendants and the claims raised in defendants' cross-complaint against Snelling arose *after* Santoro left Snelling's employ. Severing the exclusion in this case and forcing Snelling's claims into arbitration would go much further than simply severing an unconscionable provision from the agreement. To require arbitration of Snelling's claims against defendants (or, for that matter, defendants' claims against Snelling)—none of which are related to Santoro's termination, would be to remake the agreement so as to force the parties into an arbitration of issues they never contemplated could be arbitrated.

Doing so here makes no sense in terms of the two reasons for severance articulated in *Armendariz.* Snelling receives no "undeserved benefit," nor does Santoro suffer "undeserved detriment," in failing to sever the exculpatory clause, as the arbitration agreement does not cover the claims raised here. Indeed, the Supreme Court has recognized that the primary disadvantages of arbitration fall more heavily on the employee. (*Armendariz, supra,* 24 Cal.4th at p. 115.) "While arbitration may have its advantages in terms of greater expedition, informality, and lower cost, it also has, *from*

45

*the employee's point of view, potential disadvantages:* waiver of a right to a jury trial, limited discovery, and limited judicial review. Various studies show that arbitration is advantageous to employers not only because it reduces the costs of litigation, but also because it reduces the size of the award that an employee is likely to get, particularly if the employer is a 'repeat player' in the arbitration system. [Citations.] *It is perhaps for this reason that it is almost invariably the employer who seeks to compel arbitration.* [Citation.]" (*Ibid,* italics added.) The second reason generally supporting severance where possible is irrelevant here as there is no contractual relationship between Santoro and Snelling to preserve.

In this unusual case, unlike those cited by defendants, it is the former employee and his new employer (a nonparty to the arbitration agreement) who wish to arbitrate and the former employer who is resisting arbitration. In none of the cases cited by defendants in support of their severance argument is it the employee who is seeking severance in order to allow the arbitration to take place. In all, the employee contends the arbitration clause is unconscionable as being unfairly one-sided and lacking in mutuality and that the entire agreement to arbitrate is therefore unconscionable and cannot be enforced. (See *Armendariz, supra,* 24 Cal.4th at p. 120; *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 664 (*Abramson*); *Fitz v. NCR Corp., supra,* 118 Cal.App.4th at pp. 723-724 [arbitration agreement is unfairly one-sided where it compels arbitration of the claims more likely to be brought by the employee (such as those arising out of termination of employment); but exempts from arbitration the types of claims more likely to be brought by the employer against the employee, such as violation of a non-compete agreement or divulging of confidential information]; *Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 114-115 (*Martinez*) [agreement unconscionable where parties were compelled to arbitrate statutory claims, contract and tort claims, and claims of discrimination, but *not* claims by employer for injunctive or other equitable relief for unfair competition, use or disclosure of trade secrets or confidential information]; *Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 174-178 [same].) In the above cases, the court held the entire arbitration agreement unenforceable, and refused the

employer's request to sever the offending provisions.  As *Armendariz* concluded, "section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful.  Nor do courts have any such power under their inherent limited authority to reform contracts.  [Citations.]"  (*Armendariz, supra,* 24 Cal.4th at p. 125.)  The foregoing courts all found the agreements permeated with unconscionability and refused to sever the offending provisions, but instead voided the entire arbitration agreement.

Defendants cite to three unpublished federal district court cases where the court did sever the type of exclusion clause present here—excluding the employer's claims for injunctive relief for unfair competition or trade secrets from the reach of the arbitration provision.  (*Martin v. Ricoh Americas Corp.* (N.D.Cal., June 4, 2009) No. C-08-4853 EMC,  2009 U.S. Dist. LEXIS 50516; *Arreguin v. Global Equity Lending, Inc.,* (N.D.Cal., Sept. 2, 2008) No.C-07-06026 MHP, 2008 U.S. Dist. LEXIS 66732; *Siglain v. Trader Publ. Co.* (N.D.Cal., Aug. 6, 2008), No. C-08-2108 JL, 2008 U.S. Dist. LEXIS 92095.)  By doing so, the courts required the employee to arbitrate his or her claims against the employer.  Again, in each of these federal district court cases, it was the employee who sought to void the entire agreement and the employer who sought severance of the substantively unconscionable exclusion in order to force the employee to arbitrate the alleged wrongful termination or other claims.  In all of them, unlike this case, the action sought to be pursued by the employee was clearly encompassed within the arbitration provision.[19]  These three cases do not persuade us that " 'the interests of

---

[19] (See, *Martin v. Ricoh Americas Corp., supra,* 2009 U.S. Dist. LEXIS 50516, at pp. *2, 4 [employee-asserted claims of employment discrimination, intentional infliction of emotional distress, wrongful termination, breach of contract, and breach of the covenant of good faith and fair dealing fell within the scope of the arbitration provision providing for arbitration of all disputes arising out of or relating to the employment agreement or its breach, termination or validity, or the employee's compensation, promotion, demotion, discipline, discharge or terms and conditions of employment]; *Arreguin v. Global Equity Lending, Inc. supra,* 2008 U.S. Dist. LEXIS 66732, at pp. *2-4 [claims of former employee suing on behalf of herself and others similarly situated for reimbursement of job-related automobile expenses under the California Labor Code and

justice . . . would be furthered' by severance" of the exclusion clause from the arbitration agreement in the circumstances of this case. (See *Armendariz, supra,* 24 Cal.4th at pp. 123-124.)

We believe the remedy sought by defendants of compelling arbitration of disputes expressly excluded from arbitration by the arbitration agreement, in effect attempts to remake and reform the arbitration agreement entirely, under the guise of merely "severing" the offending exclusion.

The court did not err in denying defendants' motion to compel arbitration.[20]

Snelling seeks an award of attorney fees as sanctions, contending the appeal is frivolous and filed for purposes of delay. The issues raised herein were not frivolous. Nor is it clear how any delay would hurt Snelling, given that the injunction was in place. We hereby deny Snelling's motion for sanctions in connection with the filing of this appeal.

## DISPOSITION

We remand the case to the trial court to clarify the term "marketing techniques" in paragraph 1 of the injunction or to delete that term from the injunction. In all other respects, we affirm the orders granting plaintiff Snelling's motion for preliminary

---

Business and Professions Code, section 17200 et seq. came under arbitration clause providing that "any controversy, claim or dispute arising out of or relating to" the employment agreement]; *Siglain v. Trader Publ. Co., supra,* 2008 U.S. Dist. LEXIS 92095, at pp. *2 [employee's claim for disability employment discrimination was encompassed by the arbitration clause].)

[20] In light of this determination, we need not address defendants' other claims regarding the denial of defendants' motion to compel arbitration. These include claims that the exclusion is unconscionable; that the trial court erred in "reforming" the arbitration agreement; and that Snelling is equitably estopped from refusing to arbitrate with Diamond, a non-party to the arbitration agreement.

48

injunction and denying defendants' motion to compel arbitration.  Snelling is awarded its costs in connection with this appeal.


 

 

                                          _____

                                          Kline, P.J.


We concur:


_____
Haerle, J.


_____
Lambden, J.